**Walter H. KALTREIDER and Irene C. Kaltreider, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Nos. 12336, 12337.

United States Court of Appeals Third Circuit.

Argued Jan. 23, 1958.

Decided May 21, 1958.

As Amended July 17, 1958.

Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and WRIGHT, District Judge.

Robert H. Griffith, York, Pa. (Arthur Markowitz, York, Pa., C. Philip Moore, Jr., York, Pa., on the brief), for petitioners.

Arthur I. Gould, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

KALODNER, Circuit Judge.

Was real estate sold by taxpayers in 1951 and 1952 held by them primarily for sale to customers in the ordinary course of business within the meaning of Section 117(a) and (j) of the Internal Revenue Code of 1939, as amended? [1]

That is the primary question presented by these petitions for review of the decision of the Tax Court [2] which answered it affirmatively, thereby making gains on the sale of the real estate taxable as ordinary income rather than "capital gains".

A second issue presented is whether the Tax Court erred in sustaining the Commissioner's determination that taxpayers were subject to penalties for failure, under Section 294(d) (1) (A) of the Internal Revenue Code of 1939, as amended,[3] to file a declaration of esti-

---

[1]. Internal Revenue Code of 1939, as amended

"§ 117. Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

\* \* \* \* \*

"(j) Gains and losses for involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not \* \* \* (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. \* \* \*" (26 U.S.C. 1952 ed. § 117).

[2]. 28 T.C. 121.

[3]. Internal Revenue Code 1939, as amended

"§ 294. Additions to the tax in case of nonpayment \* \* \*

"(d) Estimated tax

mated tax for 1952, and for substantial underestimation of tax due for 1952, under Section 294(d) (2) of the Internal Revenue Code of 1939, as amended.[4]

Taxpayers contended in the Tax Court that they had relied solely on their accountant to file the required declaration of estimated tax; that he failed to do so and that therefore their failure to file was due to reasonable cause and not willful neglect. In rejecting the contention the Tax Court held that proof had not been presented that taxpayers' accountant was qualified to advise them concerning tax matters; that there was no evidence that their reliance on the accountant was "well placed" and accordingly the failure to file the declaration was not due to reasonable cause.

The facts may be summarized as follows:[5]

In 1936, Walter H. and Irene C. Kaltreider ("taxpayers"), husband and wife, purchased twenty-seven acres of farmland located on the outskirts of York, Pennsylvania, for $9,500.00. In 1938 they built their residence on a part of that land and continued to use the property exclusively for farming for a number of years.

On October 21, 1947, taxpayers, together with their son, Walter H. Kaltreider, Jr., a graduate engineer, organized Kaltreider Construction Inc. ("Corpora-

tion") under the laws of Pennsylvania to carry on a building and construction business.

The capital of Corporation was initially contributed by taxpayers and their son and, with the exception of twenty-five shares issued to each of taxpayers' two grandchildren on December 25, 1952, all outstanding stock has been held by them since the incorporation.

During 1951 and 1952, the taxable years in issue, taxpayers' son served as president of Corporation. The taxpayers, husband and wife, acted as treasurer and secretary respectively. Throughout this period Corporation was engaged in the construction of homes, garages, schoolhouses, and freight truck terminals.

During 1948 taxpayers developed a seven-acre tract of their twenty-seven acre farm and subdivided it into fifteen lots; Corporation constructed homes on eleven of them. In 1952 the taxpayers developed a second seven-acre tract of their farm and subdivided it into thirteen lots; Corporation constructed homes on seven of them.

Two of the homes were sold in 1949, and four in 1950, at a profit. In their joint income tax returns for the years 1949 and 1950, taxpayers treated the profits as ordinary income. On the first

"(1) Failure to file declaration or pay installment of estimated tax

"(A) In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *" (26 U.S.C. 1952 ed. § 294).

4. Internal Revenue Code of 1939, as amended

"§ 294. Additions to the tax in case of nonpayment * * *

"(2) Substantial underestimate of estimated tax. If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a) or 66⅔ per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser * * *" (26 U.S.C. 1952 ed. § 294).

5. Full details of the taxpayers' financial transactions during the taxable years involved are stated in the Tax Court's "Findings of Fact and Opinion" and need not be stated here.

page of their tax returns the taxpayers listed their occupation as "Contractor" while in Schedule "C" [6] of the tax returns, in which they specifically reported the profits, they listed the "nature of [their] business" as "Real Estate".

Five of the homes and the four remaining vacant lots [7] in the 1948 development were sold at a profit by taxpayers in 1951, the first of the two taxable years in issue. In their 1951 tax return taxpayers made allocation of sales price, costs, and gross profits between houses and lots. The profit allocated to sales of houses ($350.00) was reported as ordinary income in Schedule "C" and one half ($10,478.90) of the profit allocated to sale of the lots [8] was reported as long-term capital gain in Schedule "D".[9]

The allocation procedure established by taxpayers in their 1951 tax return was pursued in their 1952 tax return with respect to the seven homes which were built and sold that year. Profit allocated to sale of houses ($5,150) was reported as ordinary income in Schedule "C" and one-half ($6,744.50) of the profit allocated to sale of the lots on which the houses were built was reported as a long-term capital gain in Schedule "D".

On the first page of their 1951 and 1952 tax returns taxpayers listed their occupation as "Contractor". On Schedule "C" of the 1951 return taxpayers stated the nature of their business to be "Sale of Homes"; on Schedule "C" of their 1952 return it was stated to be "Contractor" and their principal product was described as "Homes".

Taxpayers' tax returns for the years 1949 to 1952, inclusive, were prepared by their accountant, John Cusma, from memoranda which they supplied him. He also prepared their declarations of estimated tax—except for the year 1952 when he failed to do so. His failure, he testified, "was purely an error on my part; he [taxpayers] had nothing to do with it."

Cusma was also Corporation's auditor and prepared its tax returns for the taxable years here involved. He had been engaged as a public accountant in York, Pennsylvania since 1944. Prior to that time he was an investigator for the United States Department of Labor.

At the request of one of taxpayers' attorneys Cusma prepared amended returns for both taxpayers and Corporation in which profit allocated to the sale of houses that year in taxpayers' original 1952 return was eliminated and included instead in Corporation's return.

On the score of the taxpayers' activities in general during the taxable years involved and the period beginning with the launching of the development in 1948 these facts may be added to those already stated:

Taxpayers were not licensed real estate brokers nor did they hold themselves out to be such; they did not list the lots in their two developments with any real estate agents; they placed no signs on the lots, nor did they advertise in newspapers. Contracts for sales of the houses in their developments were made either in the name of Corporation or Corporation and taxpayers jointly; never by taxpayers alone. With respect to the transfer of title to the houses following their sale all such transfers by deed were made by taxpayers since they were the title holders of the lots and the houses built upon them.

During the years 1949 to 1952, inclusive, taxpayers were not engaged in farming, as evidenced by their own tax returns for those years.

On the facts as stated the Tax Court made the following finding of fact:

"During the years in issue, the petitioners [taxpayers] were engaged in the business of subdividing,

6. Schedule "C"—"Profit (or Loss) From Business or Profession".

7. The lots were sold to Corporation.

8. The five lots on which the houses were built and the four vacant lots.

9. Schedule "D"—"Net Gain or Loss From Sales or Exchanges of Capital Assets, Etc."

improving and selling real estate. The lots sold by them during the taxable years under consideration constituted property held primarily for sale to customers in the ordinary course of their trade or business."

In its Opinion the Tax Court, in support of its finding, stated:

"In 1948 and again in 1952, one of the tax years in issue, the petitioners [taxpayers] incurred considerable expense in subdividing the acreage in question into some 28 lots for residential purposes. They then caused their closely held family corporation to construct houses on 18 of those lots; 12 of which were sold to individual purchasers during the taxable years under consideration. The record does not disclose what motives underlay the original purchase of the 27-acre tract. However, even were we to make the gratuitous assumption that petitioners [taxpayers] acquired the land solely for investment purposes, nothing of merit would be added to their case. When they embarked upon the development, construction, and sales program which we have outlined, they acquired the status of 'dealers' in relation to the property in issue and thereupon became engaged in the real estate business * * *."

With respect to the part which Corporation played in constructing the houses, and the taxpayers' contention that under its arrangement with Corporation the latter was to receive that portion of the purchase price allocable to the house while taxpayers received only that portion allocable to the land, the Tax Court determined that " * * * whatever was done here by the Corporation was done at the instance and for the benefit of the petitioners [taxpayers] as their agent." In connection with this last statement the Tax Court said:

" * * * It is an accepted principle of law that one may conduct a business through agents, and that because others may bear the burdens of management, the business is none the less his."

Taxpayers' position here may be summed up as follows:

Their property was acquired for residential and investment purposes; they actually farmed it for several years; they were not real estate brokers nor did they hold themselves out as such; they did not list or advertise their property, or any of it, for sale; the costs of construction of the houses were borne by Corporation and taxpayers were only paid for the land; Corporation "found purchasers for the homes" and sold them; taxpayers under their arrangement with Corporation sold the land only to one customer, Corporation.

The Commissioner's position is that the Tax Court's determination is amply sustained by the record; that it is further supported by the fact that "taxpayers declared themselves to be in the business of selling real estate [and homes] by their statement contained in Schedule 'C' of their income tax returns for the taxable years now on review", and "Similar statements * * * in Schedule 'C' of taxpayers' 1949 and 1950 income tax returns."

■ With respect to the Tax Court's findings that (1) taxpayers were in the real estate business and the properties sold by them "constituted property held primarily for sale to customers in the ordinary course of their trade or business", and (2) taxpayers' failure to file the required declaration of estimated tax for 1952 was not due to "reasonable cause", it is well-settled that such findings are "in the nature of an ultimate finding of fact and since such finding is but a legal inference from other facts it is subject to review free of the restraining impact of the so-called 'clearly erroneous' rule applicable to ordinary findings of fact by the trial court. * * *"[10]

---

10. Philber Equipment Corporation v. Commissioner, 3 Cir., 1956, 237 F.2d 129, 131; Curtis Company v. Commissioner, 3 Cir., 1956, 232 F.2d 167, 168.

■ On review of the record we are of the opinion that there is an abundance of evidence to support both of the Tax Court's findings and its Decision.

■ As to the finding with respect to the nature of taxpayers' business, these principles are well-settled:

"There is no fixed formula or rule of thumb" for determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business and "Each case must, in the last analysis, rest upon its own facts."[11] No single factor or test is dispositive.[12] Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers.[13]

■ In considering the activities of the taxpayer the rule is settled that a person may engage in business via an agent, and the sales activities of an agent for the benefit of the principal will be imputed to the principal.[14]

■ In evaluating the foregoing factors for the purpose of determining whether gain was derived from the sale of capital assets or represented ordinary income we must keep in mind the teaching that the term "capital assets" as used in Section 117 must be "construed narrowly."[15]

In the instant case these critical factors sustain the Tax Court's determination of fact and law that the properties sold by taxpayers in 1951 and 1952 were held by them primarily for sale to customers in the ordinary course of business within the meaning of Section 117(a) and (j):

Taxpayers paid $9,500 for their twenty-seven acre farm in 1936. While they farmed the land for several years thereafter, they had ceased farming in 1948 when they launched upon the initial seven-acre subdivision and development and did not thereafter resume farming operations. Taxpayer Walter H. Kaltreider, Sr. was in the cigar business from 1944 to 1949. The cost of the 1948 and 1952 developments (involving altogether fourteen acres) totalled $18,263; almost twice the $9,500 cost of the twenty-seven acre farm, and more than three times the $4,926 original cost of the acreage improved. The development and subdivision, in addition to surveying, involved extensive improvements, such as grading, fencing and stone surfacing. In addition to the development costs, taxpayers caused their family-owned corporation, in which they owned two-thirds of the stock in 1951 and more than sixty per cent in 1952, to expend $274,221 on the construction of eighteen homes,

11. Mauldin v. Commissioner, 10 Cir., 1952, 195 F.2d 714, 716; Pool v. Commissioner, 9 Cir., 1957, 251 F.2d 233, 236.

12. Gamble v. Commissioner, 5 Cir., 1957, 242 F.2d 586, 590.

13. Cases cited in notes 11 and 12; also DiLisio v. Vidal, 10 Cir., 1956, 233 F.2d 909; Cohn v. Commissioner, 9 Cir., 1955, 226 F.2d 22; Friend v. Commissioner, 10 Cir., 1952, 198 F.2d 285, 46 A.L.R. 2d 761; Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263.

14. Achong v. Commissioner, 9 Cir., 1957, 246 F.2d 445, 447.

15. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, rehearing denied, 1955, 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 823. It is there stated 350 U.S. at page 52, 76 S.Ct. at page 24:

"* * * But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 77 L.Ed. 199. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential

twelve of which were sold during 1951 and 1952, the tax years under review. Taxpayers sold $43,241 [16] stock in February, 1949. The cost of the construction of the two homes sold in 1949 (the first of the eighteen homes built on the two developments) was $36,700. The taxpayers in each instance executed, as grantors, the deeds which conveyed title to the individual purchasers of the eighteen homes which were built and sold. They also executed the deeds, as grantors, conveying title to the four vacant lots sold to Corporation in 1951. Corporation acted as taxpayers' agent in constructing the eighteen homes, advertising them for sale and in negotiating their sales. In many instances taxpayers were directly paid the consideration received on the sale of the homes. In 1949 and 1950 income tax returns they reported the profits made on the sale of the homes as ordinary income and described themselves as being in the real estate business and as "Contractors". In their 1951 and 1952 tax returns they respectively listed themselves as "Contractors" and their business as being "Sales of Homes" and "Homes".

■ It is settled that statements of this nature (self-description of business or occupation) constitute evidence of taxpayers' business.[17]

There remains for disposition taxpayers' contention that the Tax Court erred in sustaining the Commissioner's imposition of penalties for failure to file a declaration of estimated tax in 1952 as required by Section 294(d) (1) (A), and for substantial underestimation of tax due for 1952 under Section 294(d) (2).

As earlier stated, taxpayers urged, in the Tax Court, that they had relied solely on their accountant to file the 1952 declaration; he failed to do so and therefore their failure to file was due to reasonable cause and not willful neglect. We agree with the Tax Court that proof had not been presented that the accountant was qualified to advise taxpayers' concerning tax matters or that their reliance was well-placed.[18]

■ The penalty for substantial underestimation of estimated tax under Section 294(d) (2) is not subject to a reasonable cause limitation nor indeed to any other defense. Where no declaration of estimated tax is filed the estimate is considered to be zero and the penalty mandatory.[19]

For the reasons stated the decisions of the Tax Court will be affirmed.

treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended to 'relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106, 53 S.Ct. at page 75. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. See Hort v. Commissioner, 313 U.S. 28, 31, 61 S.Ct. 757, 758, 85 L.Ed. 1168; Kieselbach v. Commissioner, 317 U.S. 399, 403, 63 S.Ct. 303, 305, 87 L.Ed. 358." See also Simonsen

Industries, Inc., v. Commissioner, 7 Cir., 1957, 243 F.2d 407, 409; Pool v. Commissioner, cited Note 11.

16. The total paid-in capital of Corporation was $50,000.

17. Friend v. Commissioner, 1951, 10 T.C.M. 1119, 1122, affirmed 10 Cir., 1952, 198 F.2d 285, 46 A.L.R.2d 761; White v. Commissioner, 5 Cir., 1949, 172 F.2d 629. See also Pacific Homes Inc., v. United States, 9 Cir., 1956, 230 F.2d 755, 760.

18. Clark v. Commissioner, 3 Cir., 1958, 253 F.2d 745; Coates v. Commissioner, 8 Cir., 1956, 234 F.2d 459; Bouche v. Commissioner, 1952, 18 T.C. 144.

19. Clark v. Commissioner, cited Note 18; Treasury Regulations 111, Sec. 29.294-1 (b) (3) (A).