ROBERT W. AND MAYBELLE POINTER, PETITIONERS [1] *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 579–66.  Filed September 25, 1967.

*James A. Larpenteur, Jr.,* and *William F. Meyer,* for the petitioners.
*Merritt S. Yoelin,* for the respondent.

DAWSON, *Judge:* Respondent determined income tax deficiencies against petitioners for the years 1961, 1962, and 1963 in the amounts of $1,271.53, $2,957.67, and $2,409.36, respectively.

The issues for decision are (1) whether the petitioners' developmental activities on real estate owned by them constituted "substantial improvement that substantially enhanced" the value of the property so as to foreclose special capital gains treatment under section 1237, I.R.C. 1954,[2] and (2) whether the real estate was held by the petitioners "primarily for sale to customers in the ordinary course of their trade or business" so as to be excluded under section 1221 from general capital gains treatment. Petitioners concede that disposition of the contested issues will automatically resolve the issue with respect to tax on "self-employment income" within the meaning of section 1402.

FINDINGS OF FACT

The stipulated facts and exhibits are incorporated herein by this reference. The facts relevant to the issues presented are set forth below.

Robert W. Pointer and Maybelle Pointer (herein called petitioners) were husband and wife whose legal residence at the time of filing the

[1] On June 9, 1967, after the trial of this case, petitioner Robert W. Pointer died, but to date no executor has been appointed to represent his estate.
[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

petition with this Court was Portland, Oreg. For the years 1961, 1962, and 1963 the petitioners filed joint income tax returns with the district director of internal revenue at Portland, Oreg. The statutory notice of deficiency was mailed to them on December 23, 1965. Their 1961 joint income tax return was timely filed on June 15, 1962, pursuant to a granted extension, and the period of limitation on assessment of 1961 income tax was extended to December 31, 1965, by the execution of Form 872 (Consent Fixing Period of Limitation upon Assessment of Income and Profits Tax) by the petitioners on March 24, 1965.

Prior to 1946, Robert W. Pointer (herein called petitioner) operated his business as a sole proprietorship under the name and style of Pointer-Willamette Co. On February 4, 1946, the business was incorporated as Pointer-Willamette Co., Inc. (herein referred to as Pointer-Willamette), under the laws of the State of Oregon. Pointer-Willamette was engaged in the manufacture of heavy transportation equipment and in structural steel fabrication which included the erection of steel school building frames. Petitioner was the owner of the company until its liquidation on December 26, 1961, and, in addition, engaged in other engineering activities through 1949 from which he derived income from patent royalties and sales of invention ideas until his death.

Petitioner leased certain real property in Edmonds, Wash. (herein referred to as the Edmonds property), in 1942 for use in his unincorporated business, which lease was assigned to Pointer-Willamette upon incorporation. Pursuant to the lease arrangement, Pointer-Willamette exercised its right to first refusal of an offer to sell the land for $75,000 and received conveyance on July 25, 1961. Thereafter, Pointer-Willamette leased a portion of the Edmonds property to Tri-City Sand & Gravel Co., Inc., with an option to purchase for $62,000 at any time during the period of the lease. The remainder of the property was leased to Jack S. Bevan and Mary Jo Bevan, husband and wife, and Johnnie D. Dontos and Jane Ann Dontos, husband and wife, with an option to purchase for $76,500. On December 29, 1961, Pointer-Willamette assigned all its assets, including its interests in the Edmonds property, to the petitioner in return for his stock in connection with the liquidation of Pointer-Willamette.

In January 1965, Edmonds Dock Co., a Washington corporation, successor to the interests of Tri-City Sand & Gravel Co., Inc., exercised its option to purchase the leased property and received conveyance from the petitioner. On November 17, 1966, the Bevans and the Dontoses exercised their option to purchase the remaining leased property, and the sale is presently being consummated.

On September 28, 1945, Pointer-Willamette Co. acquired vacant real property in Spokane, Wash., where it operated a trailer-manufacturing plant on leased property, upon which to construct a new

plant. The property was never used for this purpose and was conveyed to the petitioner in 1948 in satisfaction of advances made by him to Pointer-Willamette. Petitioner sold this Spokane property on January 19, 1953, to S. G. Johnson and Imo Johnson, husband and wife, for $12,500. After securing a barge-building contract from the U.S. Government in 1942, requiring an immediate supply of gravel, Pointer-Willamette purchased on January 25, 1943, land containing gravel pits for $3,000 in Edmonds, Wash., in the near proximity of the Edmonds property. After extracting the gravel for use in its shipyard operations, Pointer-Willamette sold the land on June 7, 1951, to A. J. Jarmes for $5,000.

In 1952, Pointer-Willamette purchased other real property in Edmonds, Wash., upon which a Quonset hut was situated. Pointer-Willamette utilized the property for storage and conveyed the property to the petitioner in satisfaction of advances in the amount of $12,000 made by him to Pointer-Willamette in 1956. In 1957, the petitioner sold the property to Oakway Heating Co. for a price of $18,000.

As a result of an arthritic condition and illness the petitioner was unable to actively manage Pointer-Willamette from 1950 until its liquidation in 1961.

In 1939 the petitioners acquired their present residence in Portland, Oreg. On November 1, 1953, they acquired approximately 8.81 acres from Joseph W. Cooke, who had been approached prior to that time by the petitioner but who had been unwilling to sell, for a cash price of $20,000. On July 14, 1954, the petitioners entered into an option agreement with Arthur A. and Virginia Peters to purchase an adjoining tract of 1.82 acres for a cash price of $5,000 and on August 9, 1954, served notice of exercise of that option. The 1.82 acres was ultimately deeded to the petitioners on September 7, 1954. Both parcels, a total of 10.63 acres, are contiguous to the petitioners' residence property and herein shall be referred to as the tract. At the time of acquisition, the tract contained a stand of virgin timber, 99 walnut trees, and 44 filbert trees, as well as loganberry, boysenberry, blackberry, and blackcap bushes.

When the petitioners purchased the tract the surrounding areas had been developed into residential neighborhoods, but there was no zoning plan in effect. Shortly after the purchase, the petitioners rejected a $63,000 offer for the undeveloped tract by a local subdivider who desired to plat, survey, clear, and install water and street facilities. The fair market value of an 11-acre tract of land in the general area of the Pointer property at that time was between $35,000 and $45,000.

Richard L. Young (herein called Young) was hired in 1957 by the petitioner to continue cultivating and harvesting the crops on the tract and was to receive all proceeds from the sale of nuts and berries

as compensation. Young devoted only his spare time to this job; his regular occupation was buyer of fruit and vegetables for a cannery. From 1954 through 1958 the petitioners filed with their Federal income tax returns a Schedule F reporting gross income, expenses, and net loss from the sale of nuts and berries as follows:

|  | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|
| Gross income | $275 | 0 | 0 | $542 | $350 |
| Expenses | 1,490 | $1,177 | 0 | 1,016 | 596 |
| Net loss | 1,215 | 1,177 | 0 | 474 | 246 |

In 1957, timber from the tract was cut and sold yielding $1,304 after expenses of $350. Petitioner reported the profits as income subject to capital gains tax in their 1957 Federal income tax return. The expenditures incurred prior to 1959 by petitioners with respect to the tract were $5,739.78, as follows:

| | |
|---|---|
| Clearing (1958) | $650.00 |
| Real property taxes | 1,721.72 |
| Farming labor | 2,493.75 |
| Tractor (1954) | 554.17 |
| Legal | 82.40 |
| Maintenance and repair | 170.75 |
| Other | 66.99 |
| Total | 5,739.78 |

Pursuant to a 3-year interim zoning code established in 1957, the tract was zoned residential and remained so after the final zoning ordinance was approved in 1959. In 1958 the petitioners approached Arne Stigum (herein called Stigum) concerning the construction of single-unit residences in the tract, and in April 1959 the tract was platted and submitted for approval by the petitioner to the Washington County Planning Commission. The approved plat was recorded on July 17, 1959, as West Point Park.

The original verbal arrangement with Stigum provided for the deeding of a parcel of the tract by the petitioner to Stigum. Stigum agreed to execute a promissory note for the purchase price of the parcel payable to the petitioner in 1 year or when the parcel and residence were deeded to the ultimate purchaser, whichever occurred earlier; then Stigum would procure his own construction financing. Later the petitioner offered to provide Stigum construction financing at 6 percent per annum up to $20,000 on each home as long as the loan balance was not increased more than $5,000 per month, per home. Stigum's promissory note would evidence each such loan. If the petitioner provided the construction financing under this change in the arrangement, record title to the parcel was to remain in his name. This

arrangement was acceptable to Stigum since he would not have to pay loan costs or search for and secure construction loans from commercial financial institutions.

Prior to commencing construction, Stigum arranged with another housebuilder, Alton Fuller, to alternate buying lots and building on each side of the street. This arrangement was orally approved by the petitioners who provided construction financing for Stigum and Fuller on all but four residences built in the tract. At this time the petitioners' net worth was in excess of $250,000.

In preparing and subdividing West Point Park, the petitioners expended between 1953 and 1962 a total of $24,790.45 as follows:

| | |
|---|---:|
| Attorney's fees | $744. 50 |
| Insurance | 450. 00 |
| Clearing | 1, 200. 00 |
| Grading | 132. 33 |
| Surveying and engineering | 2, 601. 00 |
| Gravel | 340. 00 |
| Curbs—streets | 4, 402. 45 |
| Culverts | 137. 19 |
| Paving | 8, 563. 00 |
| Water | 5, 231. 75 |
| Transportation | 350. 00 |
| Sundry | 638. 23 |
| Total | 24, 790. 45 |

In addition, a sewer system was installed by the West Slope Sanitary District at no cost to the petitioners. After operating under an oral agreement from 1959, the petitioner and Young formally contracted in 1961 for Young to maintain the lots prior to their sale to the builders, to assist in road work, and to continue cultivating and harvesting crops. Young was listed as developer of West Point Park but did not engage in any selling activities or maintenance with respect to lots delivered to the builders. In the contract the petitioner agreed "to offer for sale all lots in this tract," and Young agreed to assist in the sales. Only four lots could be sold in any 1 year unless written approval was given by the petitioner. Under the contract Young received as commissions one-half the net profit from the sale of each lot, not exceeding $500 per lot. While the agreements between the petitioner and Young were effective, a total of nine lots were sold, one in 1959, one in 1960, three in 1961, and four in 1962. The arrangement was terminated in 1962 for a consideration of $1,200 paid by the petitioner.

Stigum established a tract office in the basement of a house he built on a West Point Park lot. From 1958 through 1964 Stigum and Fuller built houses on 16 lots purchased from the petitioners at prices from $5,000 to $6,000 each. Three of these houses were contract houses, built to the buyer's specification. All others were "spec" houses, built as

speculative ventures and placed on the market for sale to anyone. Petitioner required each house built to be of a good class and above $30,000 in value. Each set of construction plans was approved by him before construction began, and he maintained the right to determine the selling price of each lot. Petitioner was directly involved in the sale of four lots: Three to a neighbor, a Mrs. Petty, and one to a Mrs. Penna to supplement her residence which she had already purchased in the tract. None of the sales was solicited. One of the lots was transferred to Mrs. Petty under an arrangement whereby the petitioner and the builders agreed to forego construction on that lot if she would guarantee the builders the right to build on a lot she owned adjacent to the tract. The arrangement was intended to prevent erection of a structure on the Petty property which would impair the view of the lots in West Point Park.

The builders were not required under their contract with the petitioner to borrow the construction financing from him but did so in all but four cases. Petitioner did not demand payment of the promissory notes executed by the builders for the lots until a purchaser for the lot and house was found, even though this occurred after the 1 year provided for in the contract. As interest from the financing arrangement with Stigum and Fuller, the petitioner reported the following amounts as income:

| Year | Received from— | | |
|---|---|---|---|
| | Stigum | Fuller | Total |
| 1959 | $680 | $70 | $750 |
| 1960 | 1,985 | 1,322 | 3,307 |
| 1961 | 895 | 2,155 | 3,050 |
| 1962 | 3,065 | 1,592 | 4,657 |
| 1963 | 2,694 | 2,023 | 4,717 |
| 1964 | 1,375 | 1,119 | 2,494 |
| 1965 | 665 | 0 | 665 |
| | 11,359 | 8,281 | 19,640 |

For all the "spec" houses built it was necessary to solicit buyers. Although Fuller attempted at first to sell homes he built, eventually both he and Stigum employed real estate brokers to advertise and sell the houses. West Point Park was advertised in local papers as "a delightful area of fine homes," "the very finest location," and "Portland's finest prestige area." The realty companies held the houses open for inspection and sold the house and lot as a complete package. Each time a home was sold the closing agent would satisfy the construction loan from the petitioner, pay the commission to the real estate agent, pay the purchase price of the parcel to the petitioner, and remit the remainder, if any, to Stigum or Fuller. Conveyance of

the land was made by petitioner directly to the purchaser. The lots were sold as follows:

| Year | Number of lots sold | Year | Number of lots sold |
|------|------|------|------|
| 1959 | 1 | 1963 | 3 |
| 1960 | 1 | 1964 | 5 |
| 1961 | 3 | 1965 | 1 |
| 1962 | 4 | 1966 | 2 |

The proceeds from the sales of these lots were reported by the petitioners as long-term capital gains. Respondent determined in his notice of deficiency that such gains are taxable as "ordinary income derived from the operation of a trade or business."

The fair market value of an unimproved lot in West Point Park in 1959 approximated $2,500 to $3,000. As a result of subdivision and land improvement, the value of a lot increased to between $5,000 and $6,000. During the period from 1953 to 1959 the value of undeveloped tracts of land in the vicinity of the petitioners' property remained relatively constant.

### ULTIMATE FINDINGS OF FACT

1. Petitioners made substantial improvements on the tract platted as West Point Park which substantially enhanced the value of the lots sold during the taxable years 1961, 1962, and 1963.

2. Petitioners held the lots in West Point Park primarily for sale to customers in the ordinary course of their business.

### OPINION

Basically, the issue raised in this case is whether the proceeds from the sale of certain lots should be taxed as ordinary income or as capital gains. The definition of a capital asset in section 1221 [3] excludes those assets held primarily for sale to customers in the ordinary course of a taxpayer's trade or business. If the land in question was so held, the gains realized from the sales of lots are taxable to petitioners as ordinary income. In this connection, we look first at section 1237,[4] a

---

[3] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

[4] SEC. 1237. REAL PROPERTY SUBDIVIDED FOR SALE.

(a) GENERAL.—Any lot or parcel which is part of a tract of real property in the hands of a taxpayer (including corporations only if no shareholder directly or indirectly holds real property for sale to customers in the ordinary course of trade or business and only in the case of property described in the last sentence of subsection (b)(3)) shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale solely because of the taxpayer having subdivided such tract for purposes of sale or because of any activity incident to such subdivision or sale, if—

(1) such tract, or any lot or parcel thereof, had not previously been held by such taxpayer primarily for sale to customers in the ordinary course of trade or business

special capital gains provision applying only to limited real estate transactions, which may be determinative. However, if we conclude that the petitioners fail to qualify under section 1237, it will still be necessary to consider the applicability of section 1221(1). See sec. 1.1237–1(a)(4)(i), Income Tax Regs.; *Ralph E. Gordy*, 36 T.C. 855 (1961).

A taxpayer qualifying under section 1237 may sell lots from a single tract held for investment without the gain therefrom being taxed as ordinary income solely because the tract was subdivided or because he actively participated in the sales. Sec. 1.1237–1(a)(1), Income Tax Regs. The requisites to qualification under section 1237 are:

1. The taxpayer must have held the property for at least 5 years unless it was acquired by inheritance or devise.

2. The taxpayer may not previously have held any part of the tract primarily for sale in the ordinary course of his trade or business, nor may he hold in the year of sale any other real property for that purpose.

3. The taxpayer cannot make on the tract any substantial improvement that substantially enhances the value of lots or parcels sold.

The first two conditions are met in this case. The tract was originally purchased in 1953 and 1954; the first lot was sold in 1959, at least 5 years after purchase. Subdivision activities within 5 years of the purchase are, despite respondent's argument, irrelevant to the issue of whether the land was *held* for the requisite length of time. Since the sale of each lot was only part of an overall plan for disposing of the tract, a determination that the land sold during the years in issue was or was not held primarily for sale in the ordinary course of petitioners' trade or business will be dispositive as to all other sales. Thus, if the petitioners held the lots sold in 1961, 1962, and 1963 as capital assets, the lots sold in 1959 and 1960 were similarly held, satisfying the second requirement.

Although Pointer-Willamette was actively involved in several land transactions during the years in issue, the facts demonstrate persuasively that the land was acquired solely for the business needs of the corporation and not for sale in its ordinary course of business. This land was leased and sold by the corporation, and by the petitioner individually after the corporation was dissolved, as the most expedient

---

(unless such tract at such previous time would have been covered by this section) and, in the same taxable year in which the sale occurs, such taxpayer does not so hold any other real property; and

(2) no substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer or is made pursuant to a contract of sale entered into between the taxpayer and the buyer. * * *

\* \* \* \* \* \* \*

(3) such lot or parcel, except in the case of real property acquired by inheritance or devise, is held by the taxpayer for a period of 5 years.

way to dispose of assets which had ceased to be of value in the manufacturing and construction business. Pointer-Willamette had not donned the cloak of a "dealer" in real estate. Assuming a contrary conclusion, there would be little justification for attributing the corporation's conduct to the petitioner since he had ceased all active management of the corporate affairs by 1950. See *S. Nicholas Jacobs*, 21 T.C. 165 (1953), affd. 224 F. 2d 412 (C.A. 9, 1955), and cases cited therein.

In applying the final requisite for section 1237 coverage, the nature and extent of improvements made on the undeveloped tract are critical. Improvements will not deprive petitioners the benefit of section 1237 unless they are (1) substantial in nature and (2) substantially increase the value of the lots sold.

Consistent with the legislative intent of permitting minor or minimal improvements, the surveying, leveling and clearing, and the construction of minimum all-weather access roads, including gravel roads where required by the climate, are not considered substantial. On the other hand, hard surface roads or utilities such as sewers, water, gas, or electric lines are specifically declared substantial. Sec. 1.1237–1 (c)(4), Income Tax Regs.; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 442 (1954).

Even though the petitioners acknowledge that utilities and a paved street were installed in West Point Park, they claim an inconsistency between the regulations and section 1237(b)(3) as to the substantiality of hard surface roads. We see no inconsistency. Among other conditions, the application of the special rules of subsection (b)(3) relating to "necessary" improvements is conditioned upon the holding of the land by the taxpayer for 10 years. Since the lots in question were sold within 10 years of purchase, there is no occasion for referring to subsection (b)(3). Petitioners expended over $24,000, approximately equal to the original purchase price, in clearing, grading, and installing curbs, culverts, a paved street, and a waterline on the 10.63-acre tract. Under the regulations, which are reasonable and supported by the legislative history, these improvements must be viewed as substantial.

Next we must consider whether the improvements "substantially enhanced the value" of the lots sold. Section 1.1237–1(c)(3)(i), Income Tax Regs., provides:

The difference between the value of the lot, including improvements, when the improvement has been completed and an appraisal of its value if unimproved at that time, will disclose the value added by the improvements.

West Point Park lots were advertised for $5,000, $5,500, and $6,000 per lot in 1959 and were sold at those figures during the years in issue. The same lots unimproved would have sold in 1959 for $2,500 to $3,000

per lot. It is undisputed that this represents approximately a 100-percent increase in the value of the lots due solely to the improvements. The regulations further provide that if the value of a lot is increased by more than 10 percent all relevant factors must be considered to determine whether the increase is substantial.

"Substantial" is an illusive word. It refers to that which is large, valuable, or noteworthy, or in a negative sense, to that which is not trivial, nominal, or incomplete. Any general definition is necessarily vague because the concept is relative to the circumstances in which it is used. It would serve no useful purpose here to compare percentages and draw lines. Suffice it to say that the regulations deem it permissible to find any increase in value over 10 percent to be substantial, depending upon the particular facts. In this case the added value of $2,500 to $3,000 per lot, which is equal to the value of the unimproved lot and attributable solely to improvements, is substantial. Cf. *Estate of Peter Finder*, 37 T.C. 411 (1961). Therefore, we hold that the petitioners have failed to qualify under the provisions of section 1237.

As to the second and broader issue, petitioners contend that the tract was purchased as an investment; that it was farmed only in an attempt to cover taxes and maintenance; and that, after it had been zoned residential, it was subdivided and sold only because this was the most efficient method of realizing a profit from appreciation. In addition, it is argued that the petitioners were not physically involved in the development activities, engaged in no promotional or sales activities with respect to the tract or lots, retained title to the lots only as security for the purchase price due from the builders, and provided financing to the builders only as a convenience to them.

Respondent emphasizes the petitioner's active participation in improving and subdividing the land, in setting the price of lots and houses constructed by the builders, and in financing construction. He contends that the petitioners had reason to know from the time they bought the tract that its value would be as single-unit residential property. The fact that farming the tract was never a profitable venture is cited by respondent as proof that the petitioners intended all along to subdivide and sell it.

The issue is entirely factual, and an objective rather than subjective approach is required. *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960). In the many litigated cases involving this issue the following factors have been considered: (1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller or those acting for or in concert with him in the improvement and disposition of the property; (4) the extent of improvements made to the property sold; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held

during the taxable years. See *Raymond Bauschard*, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960). In applying these factors it must be kept in mind that the capital gains exception to the normal-tax rates is to be narrowly construed, *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955), to effectuate the purpose of reducing the tax burden upon gains realized within a tax year but which resulted from gradual appreciation over a long period of time. *Malat* v. *Riddell*, 383 U.S. 569, 572 (1966).

We will not indulge in any discussion, analysis, or comparison of the facts in each case cited by the parties, although we have considered all of them. Our decision must rest solely upon the facts and circumstances here involved. In short, the facts establish to our satisfaction that the petitioners held the West Point Park lots primarily for sale to customers in the ordinary course of their business.

The word "primarily" as used in section 1221 means "principally" or "of first importance." *Malat* v. *Riddell*, *supra*. There is no question in this case of alternative reasons for holding the property. The facts do raise, however, the possibility of a change in purpose between acquisition and sale. While the purpose at the time of acquisition has evidentiary weight, the determinative question is the purpose of the "holding" at the time of sale. *S. O. Bynum*, 46 T.C. 295 (1966). Respondent asserts that the petitioners intended from the outset to sell the property in the ordinary course of their business or, in the alternative, that they changed their original investment purpose. We need not decide the petitioners' intent at the time of acquisition since we find that at the time the tract was improved and subdivided the petitioners intended to sell the lots in the ordinary course of their business. The fact that the property was held for at least 5 years before sale is not of great weight on this issue. Several factors, however, are important.

By the time petitioner purchased the tract and began developing it he had ceased active management of Pointer-Willamette, and apparently had no other business activities. He arranged for others to develop the tract, to construct houses on the subdivided lots, and to sell each house and lot as a package. The business is no less the petitioner's because carried out through his "agents." *Walter H. Kaltreider*, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958). Petitioner did not receive the purchase price for the lots until he conveyed title to the ultimate purchasers, whether or not this occurred within 1 year of the transfer to the builders. In addition, petitioner actively controlled the quality of houses built and received $19,640 in interest on loans to the builders to finance construction. Transactions such as the one preventing erection of a structure on the Petty property which would obstruct the view from the West Point Park lots illustrate his pervasive influence over a substantial business enterprise.

Petitioners' contention that they retained bare legal title is without foundation. Although the petitioner was not directly involved in advertising the houses for sale, the advertising activities of the builders may be attributed to him. The petitioner cannot be permitted to insulate himself from the acts of those persons whose efforts were so closely related to his own. *Raymond Bauschard, supra.*

The limited number of sales in each year to only two builders is mentioned by petitioners as insufficient to show a "regular course of business" between themselves and "customers" within the meaning of section 1221(1). A restricted group of purchasers may, however, qualify as "customers." *Pennroad Corporation,* 29 T.C. 914 (1958), affd. 261 F. 2d 325 (C.A. 3, 1958). Indeed, it has been said that in real estate transactions a sale to any purchaser is, in effect, a sale to a "customer." *Charles H. Black, Sr.,* 45 B.T.A. 204, 210 (1941); cf. *Estate of Peter Finder, supra.* In this sense Stigum and Fuller were customers of the petitioners. In addition, it is plain that the individual purchasers were also "customers" of petitioners.

The decided cases are of little aid in establishing the "frequency and continuity" of sales sufficient to constitute a regular course of business. A total of 7 sales during the tax year was held sufficient in *George J. Wibbelsman,* 12 T.C. 1022 (1949), while the sale of 95 subdivided lots in 2 tax years was held insufficient in *Fahs* v. *Crawford,* 161 F. 2d 315 (C.A. 5, 1947). Rather than apply a mechanical test, one approach is to determine whether the taxpayers were engaged in activity commonly associated with a particular business. See 3B Mertens, Law of Federal Income Taxation, sec. 22.138, p. 850; *Frieda E. J. Farley,* 7 T.C. 198 (1946). The sales in West Point Park were continuous from 1959 to 1966. They were also made as frequently as the price range established by petitioner would permit. This was entirely compatible with a business plan to maintain high property values and the "exclusive" character of the development.

Finally, we note that the petitioners' own witness, a local real estate broker and subdivider with 20-years experience, testified that the fair market value of the land remained constant, from $35,000 to $45,000, between 1953 and 1959. At the time the tract was bought for $25,000 the petitioners enjoyed an instant "gain" of $10,000 to $20,000. Except for this amount, the total profit realized by them on the sale of the lots resulted solely from the improvement and subdivision of the tract, rather than from long-term appreciation.

Accordingly, we conclude on this record that the gains realized by petitioners from the sales of lots in West Point Park are taxable as ordinary income and not as capital gain.

*Decision will be entered under Rule 50.*