THOMAS B. AND MARGARET R. ACKERMANN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ackermann v. Commissioner
Docket No. 6680-74.
United States Tax Court
T.C. Memo 1976-299; 1976 Tax Ct. Memo LEXIS 106; 35 T.C.M. (CCH) 1337; T.C.M. (RIA) 760299; September 22, 1976, Filed Jerome J. Donnellon, for the petitioners. Juandell D. Glass, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1971 and 1972 in the respective amounts of $1,145.24 and $2,119.31. The only issue presented for our decision is whether improved lots sold by Margaret R. Ackermann during the years in issue were properties held primarily for sale to customers in the ordinary course of trade or business at the time of sale. This case was submitted for decision without trial in accordance with the provisions of Rule 122, Tax Court Rules of Practice and Procedure. We adopt the stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto as our findings. All pertinent facts are set forth below. FINDINGS OF FACT Thomas B. Ackermann and Margaret R. Ackermann are husband and wife whose legal residence was Cincinnati, Ohio at the time they filed their petition herein. They previously had filed joint Federal income tax returns for the taxable years 1971 and 1972 with the District Director of Internal *108 Revenue, Cincinnati, Ohio. Prior to the years in issue, Thomas Ackermann had been actively involved in the construction, rental, or sale of real estate and residential dwellings for more than a decade. The record indicates that as early as 1960 he engaged in the business of constructing residences with his brother, Jim Ackermann, while operating under the name "Ackermann Brothers." During 1966, when he was engaged in the business of real estate sales, Thomas and one Neil Stubbers organized and duly initiated a corporation for profit under the General Corporation Act of Ohio for the following purposes: A. To acquire, by purchase, lease, or otherwise, lands and interests in lands, and to own, hold, improve, develop, and manage any real estate so acquired, and to erect, or cause to be erected, on any lands owned, held, or occupied by the corporation, buildings or other structures, with their appurtenances, and to manage, lease, operate, rebuild, enlarge, alter or improve any buildings or other structures, now or hereafter erected on any lands so owned, held, or occupied, and to encumber or dispose of any lands or interests in lands, and any buildings or other structures, and *109 any stores, shops, suites, rooms, or part of any buildings or other structures, at any time owned or held by the corporation. * * *
D. For investment or otherwise in connection with all or any of its operations, purposes or businesses, to acquire by purchase, lease, exchange, hold, hire, gift, devise or otherwise, real estate or any interest therein; to erect and construct and operate houses, apartment houses, theaters, buildings, factories and works of every description on any land of the corporation, or upon any other land; to reconstruct, renovate, rehabilitate and improve existing houses, buildings, factories, or works thereon; to convert, appropriate and dedicate any such land into and for roads, streets, alleys, avenues and other conveniences; to sell, lease, let, mortgage, farm, improve and otherwise dispose of and manage the lands, houses, buildings, and other property of the corporation; to undertake or direct the management and sale of real property, buildings, and lands, and to buy, sell, lease, transfer, mortgage, improve and hold real estate of every description. (Emphasis added). * * *
Each individual owned 50 percent of the outstanding common stock *110 of the corporation, which traded under the name "Ackermann Enterprises, Inc." That corporation will be referred to hereinafter as "AEI" or "the corporation." Thomas served AEI as both director and president-treasurer from its inception through the years in issue. Margaret Ackermann was a director and secretary during that same period, while Neil Stubbers served as a director and vice-president until his stock was purchased by the corporation in 1969. Since that time Thomas has been AEI's sole shareholder. AEI was headquartered in the Ackermann's personal residence at 8080 Buckingham Road in Cincinnati during the calendar years 1969-1971.The local directories listed a separate address and phone number for the corporation in 1972. AEI was identified as Thomas' employer on each annual joint Federal income tax return he filed between 1967 and 1970, while he variously listed his occupation as contractor, builder, or executive. In 1968 he reported receiving $120.75 of real estate commissions from "Theo. Mayer" in addition to his earnings from AEI. AEI did not purchase or otherwise acquire any improved or unimproved realty during the calendar years 1969 through 1972.Between 1965 *111 and 1974, however, Thomas purchased six of such properties either in his name alone or together with Margaret Ackermann. It was the sale of portions of one of those properties which gave rise to the instant controversy. Three of the petitioners' purchases remained totally in their possession at the time of trial. One of these, a lot at 2704 Cypress Way in Cincinnati which was purchased for $15,500 in November 1967, has been substantially improved by the addition of a 15 unit apartment building. AEI constructed that building for petitioners, who receive rental income from its operation. The others, a lot on Langdon Farm Road purchased for $3,500 in 1967, and three acres of land in Milford, Ohio purchased for $28,500 in 1971, have been neither improved nor subdivided. Petitioners have retained 14 acres of an original 42 acre tract near Clough Pike in Cincinnati which was purchased for $165,000 in September 1974. Although the petitioners have neither subdivided nor improved this property, 28 acres were sold to AEI in September 1975. Petitioners' first acquisition during this period was a lot and house on Ridge Road in Cincinnati. It was purchased in October 1965 and sold without *112 having been improved in early 1966. On February 1, 1969, Thomas executed a contract to purchase approximately seven acres of unimproved real estate on Shawnee Run Road in Maderia, Ohio from one Helen Saik. Section 6(E) of that contract stated: "This offer subject to herein purchaser obtaining building permit to construct Four (4) homes." Thomas signed the contract in his individual capacity. A revised contract to purchase was executed by the same two parties on February 12, 1969, however, which provided for the transfer of the same property without the restriction formerly contained in Section 6(E). Section 7 of the revised contract provided instead that the deed of conveyance would contain a restrictive clause limiting improvements by the purchaser to a maximum of four single family residences costing at least $30,000 each. In connection with the effectuation of this revised contract to purchase, Thomas presented Helen Saik with a $2,500 check he had drawn on AEI's account which served as a downpayment on the purchase of the property. Subsequent to the execution of this revised contract, but prior to the date of actual purchase, Thomas caused AEI to have his personal acquisition *113 surveyed and subdivided for development at AEI's expense. Thomas consummated this purchase on April 14, 1969, when he received a deed of conveyance from Helen Saik in exchange for his personal checks of $1,460 payable to West Shell Robson Middendorf Inc., and $17,923.19 payable to Helen Saik. The total cost of the Shawnee Run Road property was $21,883.19 -- $2,500 of which was paid by AEI. Improvements totaling $27,812.92 were made to the Shawnee Run Road property between 1969 and 1972. Thomas personally paid for $10,457.69 of the improvements while AEI paid for the balance. AEI was later reimbursed for all of its advances. The improvements made consisted of a main driveway, 1,000 additional feet of blacktop driveway with access to each of the four new subdivided lots, a concrete and stone culvert over a creek, a drainage system, fences, concrete and stone walls, and gas, electric, and water utilities. Included among the expenses of improvement were administrative costs and interest expenses. Thomas advertised the subdivided property for sale through AEI, his wholly owned corporation, simply by placing a sign on the property. The telephone number displayed on the sign *114 was the Ackermanns' personal number from 1969 through 1972, and AEI's number from 1969 through 1971. Pursuant to a plan of subdivision, Thomas divided the original Shawnee Run Road tract into four parcels which were referred to by the letters A, B, C, and D. On September 4, 1969, he entered into an agreement with Raymond C. Wetherell whereby parcel C was conveyed to Wetherell and the parties placed various restrictive convenants upon all four parcels. It was futher agreed that the parties or their assigns would improve each of the four parcels by constructing single family residences thereon. Between September 4 and October 20, 1969, portions of the original Shawnee Run Road property were conveyed back and forth between Thomas, Margaret Ackermann in her individual capacity, one Nancy C. Johnson, and Raymond C. Wetherell. Although some minor alterations in the original parcels may have occurred as a result of these conveyances, Thomas and Margaret Ackermann each owned two of the four parcels on October 20, 1969, which substantially corresponded to two of the original parcels. Thomas owned parcels A and C on that date, while Mrs. Ackermann held parcels B and D in her name alone. *115 Parcel C subsequently was conveyed by Thomas to Herman H. Welland and Doris A. Welland on October 28, 1969. This conveyance followed his entry into a contract with the Wellands for the construction of a residence on that parcel for a total price of $82,317.48 which included both the lot and house. The price of the lot alone was determined to be $18,000. Herman Welland paid the $64,317.48 price for construction of a residence directly to AEI, which had been engaged by Thomas for the project. Thomas received the sales price of the lot individually. On December 5, 1969, Thomas sold parcel A to William A. Burnett under a similar arrangement. The portion of the total purchase price allocated to that buyer's parcel also was $18,000. Margaret Ackermann conveyed parcel B to Walter O. Weber and Diane D. Weber on April 17, 1971, and parcel D to Harold T. Verbarg and Shirley M. Verbarg on March 22, 1972, under the same arrangement. AEI was engaged to build each residence and was paid directly by the buyer. Mrs. Ackermann was paid $18,000 and $21,862.18 for parcels B and D, respectively.All proceeds from the sale of parcels A through D by either Thomas or Margaret Ackermann were deposited *116 to the account of Thomas B. Ackermann at the First National Bank of Cincinnati. Petitioners reported net long term capital gains of $7,000 and $9,846.08 on Schedule D of their joint Federal income tax returns for the taxable years 1971 and 1972, respectively. These figures reflected Mrs. Ackermann's sale of parcel B during 1971 and parcel D during 1972. Deeming those gains long term capital gains from investment, petitioners deducted 50 percent of each gain from gross income under section 1202, Internal Revenue Code of 1954, [1] and included the remainder in adjusted gross income. During each of those years petitioners were both employed by AEI and received all of their reported wages and salaries from AEI. Respondent objected to petitioners' characterization of those gains, reclassified the gains from all four sales as ordinary income, and issued a statutory notice of deficiency for calendar years 1971 and 1972 which increased petitioners' taxable income by $3,500 in 1971 and $6,455.90 in 1972. Petitioners assert that the gains were properly *117 reported because section 1237 of the Code "… sets forth clearly the intent of Congress to be liberal in the application of Capital Gains rules to the subdivision of real estate involving a small number of lots." ULTIMATE FINDINGS OF FACT 1. Margaret Ackermann held the Shawnee Run Road property, as subdivided, primarily for sale to customers in the ordinary course of a trade or business immediately prior to the sale of parcels B and D in 1971 and 1972, respectively. 2. Thomas and Margaret Ackermann were both engaged in the same trade or business during the years in issue and in prior years. OPINION This controversy arose from petitioners' utilization of the 50 percent of net long-term capital gains in excess of short-term capital losses deduction when computing taxable income derived from the sale of subdivided properties during the years in issue. Section 1202 of the Code provides in pertinent part that: In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount *118 of such excess shall be a deduction from gross income. The key issue here concerns whether parcels B and D were capital assets when sold. Section 1221 of the Code provides guidance on this question when it states: Sec. 1221. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business…. (Emphasis added). Thus, it is clear that all assets are "capital assets" unless listed specifically in one of the subsections of section 1221. We have found that both petitioners were engaged in purchasing, subdividing, and selling real estate to customers in the ordinary course of a trade or business during the years in issue. More specifically, we have found that Margaret Ackermann held parcels *119 B and D for sale to customers in the ordinary course of business immediately prior to their respective sales in the taxable years 1971 and 1972. The determinative question is the purpose for her "holding" at the time of sale. See, e.g., Robert W. Pointer,48 T.C. 906 (1967), affd. 419 F. 2d 213 (9th Cir. 1969); S. O. Bynum,46 T.C. 295 (1966). In light of our ultimate findings we now hold that petitioners are not entitled to take a section 1202 deduction in either year with respect to the sales of those parcels. An objective analysis must be applied when a factual issue is presented. Kelley v. Commissioner,281 F. 2d 527 (9th Cir. 1960). Prior cases addressing this issue have considered the following factors: (1) the purpose for which the asset was acquired; (2) the frequency, continuity, and size of sales; (3) the activities of the seller or those acting for or in concert with him in the improvement and disposition of the property; (4) the extent of improvements made to the property sold; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held after purchase. See Westchester Development Co.,63 T.C. 198 (1974); *120 Robert W. Pointer,48 T.C. 906, 916 (1967), affd. 419 F. 2d 213 (9th Cir. 1969); Raymond Bauschard,31 T.C. 910 (1959), affd. 279 F. 2d 115 (6th Cir. 1960). The facts stipulated herein support our holding when each factor is considered. Thomas never attempted to conceal his early desire to develop the original Shawnee Run Road property. Indeed, the original contract to purchase that property was made contingent upon his success in obtaining building permits for the envisioned homesites, and he caused the land to be surveyed for development prior to its conveyance to him. After the conveyance was made, Thomas immediately began advertising the property for sale through his solely owned corporation and conveyed portions of the property to various individuals, including his wife. On or about October 20, 1969, Thomas and Margaret Ackermann held all of the original undivided tract between them. Eight days later the first parcel was sold to an unrelated third party buyer, and a second was quickly sold in December 1969. Although the two remaining parcels were not sold until 1971 and 1972, the record clearly indicates *121 that the Ackermanns always intended to sell them and actively sought purchasers until they were sold. Petitioners also intended to profit from any improvements made on the properties, as illustrated by the package deals they negotiated with each purchaser calling for AEI to build homes on the individual lots after conveyance of the real estate. Petitioners also caused each parcel to be improved substantially prior to sale. The total improvements of $27,812.92 exceeded the original purchase price of all four parcels by almost $6,000. These facts, in combination with the eventual sale of all four parcels within three years of purchase, convince us that the Ackermanns held parcels A through D for sale to customers in the ordinary course of a trade or business. Thomas Ackermann's prior history of real estate dealings and his concurrent ownership of other properties, while not determinative, are consistent with our holding. Petitioners contend that Thomas' prior history does not include a sufficient number of purchases and sales to warrant classifying him as a dealer, that his past activities do not support a conclusion that he was in the trade or business of buying and selling *122 real estate, and that their claimed deductions should stand unaltered because section 1237 of the Code evinces a congressional intent to liberalize the application of capital gain rules to the subdivision of real estate into a small number of lots. It is contended further that this case violates the petitioners' constitutional rights because the obligation to defend against an unreasonable tax assessment at great cost imposes an unreasonable fine upon them in violation of the eighth amendment. In this regard it is asserted that the assessment was "… contrived not upon the facts, but by administrative art designed to achieve a legal [precedent] to set aside the Congressional intent of Section 1237 of the Internal Revenue Code of 1954." We are not persuaded by petitioners' first two assertions because we believe that the record as a whole requires contrary conclusions. Their assertions focus solely upon Thomas' activities during the years in issue, but ignore the acts of others which are attributable to him. Such a narrow view cannot be accepted here where Thomas acted in concert with his wife and Raymond C. Wetherell, among others, and intermingled *123 his alleged personal investment program to such an extent with the profit-making activities of his wholly owned development corporation. On more than one occasion Thomas used AEI's corporate assets to his personal advantage. Petitioners' interpretation of section 1237 appears to be misguided as well, because Congress never intended for the relief offered therein to be extended to taxpayers in a trade or business of buying and selling real estate. That section was intended to protect investors from arbitrarily being classified as being in a trade or business of dealing in real estate merely because they subdivided properties held for investment in order to facilitate sale at a maximum market price. Section 1237 provides, in pertinent part, as follows: Sec. 1237.(a) GENERAL.--Any lot or parcel which is part of a tract of real property in the hands of a taxpayer other than a corporation shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale solely because of the taxpayer having subdivided such tract for purposes *124 of sale or because of any activity incident to such subdivision or sale, if-- (1) such tract, or any lot or parcel thereof, had not previously been held by such taxpayer primarily for sale to customers in the ordinary course of trade or business (unless such tract at such previous time would have been covered by this section) and, in the same taxable year in which the sale occurs, such taxpayer does not so hold any other real property; and (2) no substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer or is made pursuant to a contract of sale entered into between the taxpayer and the buyer. For purposes of this paragraph, an improvement shall be deemed to be made by the taxpayer if such improvement was made by-- (A) the taxpayer or members of his family (as defined in section 267(c)(4)), by a corporation controlled by the taxpayer, or by a partnership which included the taxpayer as a partner; or (B) a lessee, but only if the improvement constitutes income to the taxpayer; or (C) Federal, State, or local government, or political subdivision thereof, but only if the improvement *125 constitutes an addition to basis for the taxpayer; and (3) such lot or parcel, except in the case of real property acquired by inheritance or devise, is held by the taxpayer for a period of 5 years. (Emphasis added). The use of the word "solely" indicates the true intent of Congress here as does the explicit language of subsection(1). In order to qualify for section 1237 relief, a taxpayer first must meet the threshold test imposed by section 1221 by demonstrating that he is selling a "capital asset." Once that hurdle is passed, a qualifying taxpayer may claim section 1237 relief by showing that he has made only minor improvements to the subdivided property in order to facilitate sale at an optimum market price. We note that petitioners would fail to qualify for section 1237 relief even if we were to hold that they were not engaged in a trade or business. One reason for this is their failure to hold the lots for five years in compliance with section 1237(a)(3). Petitioners' argument that they fall within the spirit of section 1237, if not the precise wording of that provision, is *126 not persuasive because the capital gains provisions in the Code are exceptions to the normal tax rate and must be construed narrowly. Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). We think the petitioners' eighth amendment claims are without merit. In our view respondent's determination is not unreasonable. Any costs associated with petitioners' defense are the product of an unwise deduction. To reflect the conclusion reached herein, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩