WARREN K. AND PAULA K. LEWELLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewellen v. Commissioner
Docket No. 12775-78.
United States Tax Court
T.C. Memo 1981-581; 1981 Tax Ct. Memo LEXIS 162; 42 T.C.M. (CCH) 1355; T.C.M. (RIA) 81581; October 5, 1981. Warren K. and Paula K. Lewellen, pro se. Maureen T. O'Brien, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Marvin F. Peterson pursuant to the provisions of section 7456(c) of the Internal Revenue Code[1] and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION *166 OF THE SPECIAL TRIAL JUDGE PETERSON, Special Trial Judge: Respondent determined the following deficiencies and additions to tax under section 6651(a): Addition to tax
Taxable Year
Deficiency
(Sec. 6651(a))
1970
$ 13,852.68
0
1971
9,056.30
0
1972
11,922.39
$ 2,980.60
1973
3,142.26
785.57
1974
3,439.77
0
1975
174.97
43.74
Concessions having been made, the issues for decision are (1) whether petitioners' farming activities in Bedford, Massachusetts constituted an activity not engaged in for profit, within the meaning of section 183, during the taxable years at issue; (2) whether petitioners incurred a deductible loss due to the death of two cows during 1973; (3) whether petitioners incurred a deductible loss due to the destruction of their barn and its contents by fire during 1973; (4) whether the gain realized by petitioners from the sale of lots during the taxable years 1970 through 1974 is taxable as ordinary income; (5) whether petitioners realized an amount in excess of that reported from the sale of a certain parcel of land during 1971; and (6) whether petitioners are liable for the section 6651(a) addition to tax for the taxable *167 years 1972, 1973 and 1975. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Petitioners resided in Bedford, Massachusetts at the time they filed their petition herein. Petitioners filed their 1970, 1971 and 1974 joint Federal income tax returns with the Director, Andover Service Center, Andover, Massachusetts. Petitioners gave to Revenue Agent William Scully their 1972, 1973 and 1975 joint Federal income tax returns on December 2, 1975, May 25, 1976, and September 24, 1976, respectively. An Application for Automatic Extension of Time to File the United States Individual Income Tax Return (Form 4868) was filed by the petitioners for the taxable year 1975 on April 15, 1976. No other applications for extension were filed by petitioners for the taxable year 1975, nor were any ever filed for the years 1972 and 1973. During the years 1970 through 1975 petitioners utilized the cash receipts and disbursements method of accounting for Federal income tax purposes. Petitioner Warren K. Lewellen (hereinafter petitioner) received a Bachelor of Science degree in engineering in 1930. He was employed by the Massachusetts Electric *168 Company from 1935 to his retirement in 1970. Petitioner Paula K. Lewellen (hereinafter Paula) was a real estate broker from 1944 through 1975. Paula carried on her business out of the family residence. Petitioner purchased a 131 acre parcel of farmland near Bedford, Massachusetts (hereinafter Bedford land) in 1946 for $ 12,500. Bedford is a developed suburban community with little land available for subdivision. Nine acres of the Bedford land were leased to the Federal Government, Department of Defense (hereinafter Department) for use as a Nike site from 1956 to 1978. The Department also had partial use of six other acres for an access road and tree cutting rights. The topography of the Bedford land, apart from the Department's Nike site and prior to subdivision by petitioner, was as follows: Approximate Acreage
Topography
40 acres
Tillable land
20 acres
Orchard/Pasture
57 acres
Forest land/Wetland 5 acres
Farmhouse and yard
The Bedford land was purchased at the behest of petitioner's father. No prior investigation as to the likelihood of profitable farming in the Bedford area was conducted by petitioner. During the first year of ownership petitioner *169 hired the former owner to farm the land but he was discharged when it was discovered that the farm was operating at a loss. Petitioner and Paula thereupon farmed the land themselves from 1947 through the taxable years at issue, with the occasional help of their son Jonathan and unskilled laborers in the area. Petitioner's son was never paid a fixed wage based on the value of his services, rather, payments for work performed were based on his need. Petitioners have never been able to operate the farm at a profit although they experimented with different types of crops and farming methods, and often sought the advice of the Department of Agriculture. From 1947 through 1969 petitioner concentrated his efforts on the apple orchard, and although a good crop was usually harvested the farm expenses greatly exceeded the receipts for every year from 1947 through 1969. In 1968 petitioner decided to try raising cattle, and, after deciding that the Bedford land would not support a herd of the size desired, petitioner bought 335 acres of land in Ashland, New Hampshire (hereinafter Ashland land). Petitioner intended to sell the Bedford land and transfer the cattle to the Ashland land. *170 Petitioner's son contracted a chronic illness in 1970, and due to the continuing cost of treating this illness petitioner and trouble making the monthly mortgage payments on the Ashland land. As a result, in 1975 the Ashland land was lost through foreclosure. Petitioner had intended to raise Aberdeen Angus beef cattle on the Ashland land. Petitioner preferred this breed over others because of the disease resistance capability of the breed and its ability to reproduce at a relatively young age. In addition, petitioner selected the Aberdeen Angus breed because he was "favorably disposed to them [as] a youngster out in Iowa." Petitioner kept records of cattle purchases but no records of the natural increase in the size of the herd were kept. Petitioner purchased 8 cows in 1968 and 5 cows in 1969. In addition, on one occasion, petitioner and his family ate the beef from the cattle he raised. In 1970 petitioner decided that since the orchard continued to be unprofitable he would grow sweet corn and strawberries on 15 of the 40 tillable acres. Prior to making this change, petitioner consulted the Department of Agriculture to determine which crops could be grown profitably, and *171 was told to plant blueberry bushes. Petitioner decided that this would require too much capital, however, and disregarded the advice. For the taxable years at issue petitioner claimed the following expenses (including depreciation) and realized the following income, resulting in the indicated losses which petitioner claims are deductible farm losses: Year
Expenses
Income
Loss
1970
$ 13,064.62
$ 1,303.85
$ 11,760.77
1971
20,044.29
1,594.60
18,449.69
1972
18,162.12
3,575.87
14,586.25
1973
20,240.81
6,629.28
13,611.53
1974
26,708.01
9,290.67
17,417.34
1975
12,030.08
5,339.11
6,690.97
TOTAL
$ 110,249.93
$ 27,733.38
$ 82,516.55
Sometime during 1973 two of petitioner's cows died. Petitioner discovered that the two cows had entered a field of ripe sweet corn through a gap in a fence, and proceeded to feed on the corn overnight until they died. Petitioner found the cows lying on their sides and determined after an examination of the carcasses that they had indeed died from excessive feeding. Petitioner did not have a post mortem examination performed on the animals to verify his conclusions since that would have cost $ 100 per animal. *172 Petitioner's adjusted basis in each of the cows was $ 400. Petitioner claimed a depreciation deduction of $ 50 for each cow on his 1971 and 1972 Federal income tax returns. The fair market value of each of the cows at the time of death exceeded $ 500. On his 1973 Federal income tax return petitioner claimed an ordinary loss deduction due to casualty for the death of the two cows. On January 4, 1973, petitioner's barn and its contents were destroyed by fire. Petitioner had used the barn to store farm machinery and equipment and 2,000 bales of hay which he had grown. In addition, petitioner stored a number of antiques and other household items in the barn which were destroyed by the fire. Several large items, such as a garden tractor and an irrigation pump, were missing from the barn area after the blaze indicating that arson was the cause of the blaze. Shortly after the fire petitioner compiled a detailed list of the missing and destroyed items indicating the purchase price of the item and the amount of depreciation previously claimed. Petitioner claimed a loss based on the adjusted basis of the tools, machinery and equipment. Petitioner determined the amount of the loss *173 for the barn by subtracting the insurance proceeds of $ 13,300 received for the barn from $ 13,316.21, the amount spent for erecting a new barn in 1973. The barn was fully depreciated at the time of the fire with the most recent depreciation deduction claimed in 1970 in the amount of $ 80. Petitioner spent $ 2,011.52 on the purchase of 2,000 bales of hay in 1973 to replace the 2,000 bales that had been destroyed. Petitioner received $ 2,000 as compensation from his insurer for the loss of the hay. The difference between these two sums was claimed as a casualty loss. With respect to the household items and antiques, petitioner did not include in his 1973 income tax return any of the insurance proceeds received, but subtracted the insurance proceeds from the cost of the items lost and claimed the resulting sum as a casualty loss. Petitioners claimed a deduction of $ 2,723.05, as follows: Item
Amount
Tools, machinery and equipment
$ 343.67
New barn to replace fully depreciated old barn
16.21
Replace 2,000 bales of hay
11.52
Household items lost in barn
2,351.65
The household items (including the antiques) were valued at cost, although in a few instances the *174 fair market value of the item was less than cost. Petitioner divided the non-tillable sections of the Bedford land into residential lots and began selling these lots in 1957. From 1957 through 1978 petitioner sold the following lots, with each lot comprising an area of approximately one acre: Location
Year
Lot Number
Notre Dame Road
1957
1
1966
2
1968
5
1969
3, 4, 6
1970
7, 8, 9, 10
Davis Road
1971
A, D, E, K, L
1972
C, F, G, M
1973
H
1974
J
1976
B
Revolutionary Ridge Road
1977
2, 3, 4, 10, 11, 12
1978
5, 6, 8, 9
The following is the amount realized and expenses incurred from the sale of lots during the taxable years at issue: [3]
Year
Lot. No.
Selling Price
Closing Costs
1970
9
$ 10,000
7, 8, 10
31,500
$ 1,039.50
1971
D
9,000
364.52
E
10,000
82.60
K
10,500
355.18
L
10,500
181.50
1972
C
10,500
185.80
F
10,500
305.50
G
10,500
300.00
M
14,500
220.90
1973
H
12,000
[4] 2,009.00
1974
J
11,900
45.36
*175 Petitioner filed plans with the Planning Board of the Town of Bedford, Massachusetts (hereinafter Planning Board), for the eight house lots for the subdivision on Notre Dame Road on October 16, 1967, and August 2, 1969. The Planning Board required petitioner to construct a road measuring 40 by 600 feet and to install an eight inch water main and underground electrical service. On July 2, 1970, a third plan was filed with the Planning Board for 12 house lots on Davis Road for which petitioner installed a 590 foot water main. The following summarizes part of the road and engineering costs incurred by petitioner in the development of the subdivisions: Year
Road Costs
Engineering
1968
$ 4,512.50
$ 544.55
1969
7,813.62
375.96
1970
4,160.94
1,506.40
1971
5,208.08
1,163.00
Petitioner deducted these expenses in the year incurred. Originally, petitioner relied on word-of-mouth advertising to promote the sale of the lots, but in 1972, he spent $ 70 advertising his lots in the Boston Globe. Most of the lot sales were made when *176 petitioner was delinquent in property tax payments or when substantial medical expenses were incurred on behalf of petitioner's son. Paula, as a licensed real estate broker, handled the negotiation and sale of the lots. For the taxable years 1970 through 1974 petitioner claimed capital gains treatment for the gain realized from the sale of the lots. In 1971 petitioner sold Lot A and reported $ 9,500 as the amount realized from the sale on his Federal income tax return. Copies of the purchase and sale agreement and Sale of Real Estate Account prepared by petitioner's attorney reflect a sales price of $ 12,500 for Lot A. On April 4, 1973, petitioner suffered a broken neck when a tractor he was riding on tipped over. Petitioner did not recover from this injury until the latter part of 1973. OPINION The first issue for decision is whether petitioner's farming operation was an activity not engaged in for profit within the meaning of section 183. Section 183(a) provides that deductions attributable to an activity not engaged in for profit will not be allowed, except to the extent provided *177 by section 183(b). [5]Section 183(b)(1) allows those deductions which would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) allows as a deduction those amounts that would be allowable only if such activity was engaged in for profit, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." A rebuttable presumption of profit activity is raised provided gross income exceeds related expenses for any two of five consecutive taxable years ending with the taxable year at issue. Section 183(d). Since the farm operated at a loss at all times during its ownership by petitioner, the presumption is not raised. Accordingly, it must be determined whether petitioner's losses are deductible under section 162 or section 212(1) or (2). *178 Deductions are allowable under section 162 for expenses related to carrying on activities which constitute a trade or business, and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income. Petitioner bears the burden of proving that the activity was entered into or conducted for the purpose of making a profit. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Boyer v. Commissioner, 69 T.C. 521, 537 (1977). Greater weight is given to objective facts than to petitioner's mere statement of intent. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). The applicable standard is whether the taxpayer engaged in the activity with the primary or dominant motive of making a profit. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), *179 affd. 615 F.2d 578 (2d Cir. 1980). It is not required that the taxpayer have a reasonable expectation of making a profit; however, the expectation of profit must be bona fide. Dunn v. Commissioner, supra; Benz v. Commissioner, 63 T.C. 375, 383 (1974). Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are contained in section 1.183-2(b), Income Tax Regs. Briefly, these factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the amount of time expended by the taxpayer on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dismissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the presence of personal pleasure or recreation *180 in conducting the activity. No one factor is dispositive of the issue, but rather, all of the facts and circumstances must be considered. Section 1.183-2(b), Income Tax Regs.; Allen v. Commissioner, 72 T.C. 28, 34 (1979). After reviewing the record, we must conclude that with the exception of the cattle operation, petitioner's farming operation (farming operation) was an activity not engaged in for profit within the meaning of section 183, during the taxable years at issue. Several facts lead us to this conclusion. First, petitioner did not operate the farm in a businesslike manner. The regulations provide that conducting an activity in a businesslike manner and maintaining "complete and accurate books and records" is an indication that the activity is engaged in for profit. Section 1.183-2(b)(1), Income Tax Regs. Although petitioner did keep fairly detailed books for each of the taxable years, they contained serious and glaring errors, and did not accurately reflect the farm operation in the manner generally needed for management and planning in a true business operation. For instance, several items *181 of personal expense, such as gasoline payments for Jonathan's car, were deducted as farm expenses. Further, non-farm related income was included in the gross receipts. Other items of income and expenses were mere estimates even though written receipts were available. Another factor indicating petitioner lacked the requisite profit motive is the manner petitioner entered into and conducted the farming operation. Petitioner purchased the Bedford land because his father indicated it would be the smart thing to do, but petitioner did not investigate whether he could make money farming, nor did petitioner demonstrate that his father made any such prior study. See section 1.183-2(b)(2), Income Tax Regs. Further, although petitioner sought the advice of experts, such advice was routinely ignored because petitioner was unwilling to make a significant commitment of capital. Another important factor is that petitioner worked full time at another job while he operated the farm from 1946 through 1970. From at least 1970 through 1974, petitioner spent a significant amount of time preparing parcels of land for sale as lots in addition to tending to the farm. No *182 qualified people were hired by petitioner to help him run the farm at any time. All of these factors rebut petitioner's contention that he had a bona fide expectation of operating the farm at a profit. See section 1.183-2(b)(3), Income Tax Regs.
Perhaps the most compelling factor indicating that petitioner lacked the requisite profit motive is that the farming operation produced losses for 29 consecutive years, including losses totaling $ 82,516.55 during the taxable years at issue. [6] The presence of substantial losses over a period of many years is an important factor indicative of a taxpayer's intent. Jasionowski v. Commissioner, 66 T.C. 312 (1976); section 1.183-2(b)(6), Income Tax Regs. Further, petitioner had substantial outside income from his employment at Massachusetts Electric Company and from the sale of lots which along with the continued unprofitable operation of the farm strongly suggest that petitioner's farming operation was not engaged in for profit. See section 1.183-2(b)(6) and (8), Income Tax Regs.
*183 Petitioner contends that his farming operation was necessary to save the land from weeds and erosion thereby preserving its tillable character. Petitioner maintains that under section 212(2), his costs are deductible because the amounts were expended for the conservation and maintenance of property. This is not enough, however, to prevent the application of section 183 because such amounts must be expended on property held for the production of income. Petitioner has failed to establish that the Bedford land was held for the production of income through the farm operation. Accordingly, we find that petitioner's farm operation was an activity not engaged in for profit within the meaning of section 183. Although we are convinced that petitioner's cattle operation was an activity engaged in for profit, due to inadequate records petitioner was unable to show whether this operation incurred a separate loss. There is a dispute between the parties concerning a casualty loss because of the death of two cows caused by overeating corn, but we need not decide whether a casualty was sustained since petitioner is entitled to a deduction for the loss under section 165(c)(2), which allows *184 a deduction for losses incurred in connection with property held for the production of income, in the amount of $ 500 per cow. Petitioner claimed another casualty loss due to a fire which destroyed his barn, 2,000 bales of hay, tools, machinery and equipment, household goods and antiques. Section 165(c)(3) allows a deduction for losses by fire, storm, shipwreck or other casualty, or from theft, to the extent such loss exceeds $ 100. The amount deductible for nonbusiness property that is destroyed is limited to the difference between the value of the property immediately preceding the casualty and its value immediately after the casualty, but not in excess of an amount equal to the adjusted basis of the property, reduced by any insurance or other compensation. Helvering v. Owens, 305 U.S. 468 (1939); section 1.165-7(b)(1), Income Tax Regs.
With regard to the barn and hay loss, no deductible loss was sustained since the insurance proceeds received equaled or exceeded the adjusted basis of the property. Petitioner also lost several tools and *185 some machinery and equipment in the fire. Petitioner claimed his adjusted basis of $ 343.67 as a casualty loss. As we stated above, the loss is limited to the lesser of the decrease in fair market value and the adjusted basis, reduced by any insurance or other compensation received. Helvering v. Owens, supra.The tools, machinery and equipment were not covered by insurance, and petitioner received no compensation for the destruction of these items. There is no evidence in the record concerning the fair market value of this class of items, but we are satisfied based on petitioner's description that the fair market value exceeded the adjusted basis. Accordingly, $ 343.67 is allowed as a deduction. The final category consists of household goods and antiques petitioner had stored in the barn. Petitioner claimed a $ 7,198.65 basis in these items, and taking into account insurance proceeds in the amount of $ 4,847, he arrived at a loss of $ 2,351.65. Petitioner did not maintain written records of the items stored, but shortly after the fire, he and Paula compiled a detailed list showing each item and its cost. Paula was a credible witness and she provided detailed *186 testimony as to each item destroyed. Based on her testimony, and the list petitioner and Paula compiled, we find that petitioner suffered a $ 2,100 loss due to the destruction of the household goods and antiques. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Based on the foregoing, we find that petitioner is entitled to a casualty loss deduction due to the fire in the amount of $ 2,443.67 ($ 343.67 + $ 2,100.00), less the $ 100 exclusion, pursuant to section 165(c)(3). The next issue for decision is whether petitioner realized ordinary or capital gain income from the sale of parcels of the Bedford land during the taxable years 1970 to 1974. Respondent contends that petitioner realized ordinary income under section 61 because the real estate lots sold were not capital assets under section 1221. Respondent maintains petitioner failed to meet the requirements of the capital asset definition of section 1221 because the property sold was held by petitioner "primarily for sale to customers in the ordinary course of his trade or business." Petitioner contends that he is entitled to treat the lots as capital assets because he was pursuing an orderly course of *187 liquidation of the Bedford land and was not in the real estate business. [7]
Section 1221 defines a capital asset as any property held by the taxpayer, but not including property held "primarily for sale to customers in the ordinary course of his trade of business." Since the capital gains provisions are an exception to the normal tax rates, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955). The Supreme Court has held the term "primarily" to mean "of first importance" or "principally." Malat v. Riddell,383 U.S. 569, 572 (1966). There have been a number of cases deciding whether property was held primarily for sale to customers in the ordinary course of business, but the ultimate decision in each case depends upon a consideration of all of the relevant facts and circumstances. As we stated in Thompson v. Commissioner, 38 T.C. 153, 163 (1962), *188 affd. in part and revd. in part, 322 F.2d 122 (5th Cir. 1963): "The numerous cases dealing with the question * * * have provided no rule of thumb by which an answer may be reached. The precise facts of each case are determinative, and of the various criteria to be considered, no one constitutes a decisive test. * * *" The criteria which are considered relevant in deciding this issue include the nature and purpose of the acquisition and ownership; the extent and nature of the taxpayer's efforts to sell the lots; the number, frequency, and substantiality of the sales; and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. Thompson v. Commissioner, supra; McManus v. Commissioner, 65 T.C. 197 (1975), affd. 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959 (1979); United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969). This issue is basically a factual one, and its resolution requires an objective rather than subjective approach. Pointer v. Commissioner, 48 T.C. 906, 915 (1967), *189 affd. 419 F.2d 213 (9th Cir. 1969). The primary factor to consider is that since 1957, petitioner sold 31 lots over a 12 year period and during the taxable years at issue realized $ 151,400 from these sales. Such continuous and substantial sale of lots over a long period of time strongly suggests that the lots were held primarily for sale to customers in the ordinary course of business. Further, we do not believe petitioner's contention that he was following a course of liquidation in view of the substantial improvements made to the land for landscaping, the installation of utilities, the costs incurred for engineering and the extensive road construction, all completed prior to the sale of lots. Although there was only a limited amount of advertising, no more was necessary since the Bedford land was located in a seller's market, and Paula, as an active real estate broker, handled the negotiation and sale of the lots. Paula's activities as a broker combined with petitioner's physical work on the lots further suggest that petitioner and Paula were in the business of selling real estate. We do recognize that at the time of acquisition this portion of the Bedford land *190 may have been held for investment purposes, and such an intention is entitled to some evidentiary weight, however, the determinative factor is the purpose for which the property was held at the time of sale. Bynum v. Commissioner, 46 T.C. 295 (1966). Based on all of the facts in the instant case, considered in the light of the enumerated criteria, we hold that the lots were held by petitioner primarily for sale to customers in the ordinary course of business, and that the gain realized is taxable as ordinary income. The next issue involves a determination of the amount realized from the sale of Lot "A" during 1971. Respondent contends the lot sold for $ 12,500, while petitioner contends it sold for $ 9,500. The respondent's determination is presumptively correct, and petitioner has the burden of proving it wrong. Welch v. Helvering, supra; Rule 142(a), Tax Court Rules of Practice and Procedure. The respondent's determination is based on the purchase and sale agreement, and the Sale of Real Estate Account, both of which reflect a sales price of $ 12,500. Petitioner testified that the higher sales price was indicated so the purchasers could obtain financing, *191 but that the actual amount received was only $ 9,500. Although petitioner testified that other evidence was available to support his position, no evidence other than his own testimony was offered. Under these circumstances, we find his testimony insufficient to refute respondent's determination. Accordingly, respondent is sustained on this issue. The final issue for decision is whether petitioners are liable for the section 6651(a) addition to tax. Section 6651(a) imposes an addition to tax for failure to file a return on or before the date prescribed for filing such return (determined with regard to any extension of time for filing), unless the failure to file the return is due to reasonable cause and not due to willful neglect. The burden of proving that the addition to tax should not be imposed rests with petitioner. Bebb v. Commissioner, 36 T.C. 170 (1961). Petitioner's 1972 return was due on April 15, 1973, but was not filed until December 2, 1975. On April 4, 1973, petitioner broke his neck but he recovered from this injury by the end of 1973. Although *192 the illness of the taxpayer may constitute reasonable cause in certain instances, see generally Williams v. Commissioner, 16 T.C. 893, 906 (1951), in the instant case petitioner did not file his return until approximately two years after his recovery from the injury and offered no further reasons for such delay. Accordingly, we find petitioner's failure to file was not due to reasonable cause and sustain respondent's determination. With respect to the taxable years 1974 and 1975 petitioner testified that the delay in filing was due to a heavy workload and a lawsuit he was a party to. The regulations promulgated under section 6651 provide in part: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to reasonable cause." Section 301.6651-1(c)(1), Income Tax Regs. We find that the failure to timely file the 1974 and 1975 returns was not due to reasonable cause. Even assuming that much of petitioner's time was spent with the lawsuit, and preparing the lots for sale and tending to the farm, we do not believe that this constitutes *193 reasonable cause. As we said in Dustin v. Commissioner, 53 T.C. 491, 507 (1969), affd. 467 F.2d 47 (9th Cir. 1972): "[W]e are of the opinion that a person exercising ordinary business care and prudence would not take on such a load that he could not fulfill his own legal obligations within the required time." We have found that petitioner's failure to file his 1975 Federal income tax return was not due to reasonable cause, but we note that the applicable percentage rate is incorrect. Respondent determined that petitioner is liable for the full 25% addition to tax because petitioner filed his return more than five months after it was originally due. See section 301.6651-1(a), Income Tax Regs. Respondent's calculation disregards the fact that petitioner filed an application for an automatic two month extension, which must be taken into account. Therefore, the applicable percentage rate should be computed from the expiration of the period of extension. See Gamble Construction Co. v. Commissioner,T.C. Memo. 1978-404. Accordingly, we find that since petitioner's return was filed on September 24, 1976, and *194 the automatic extension expired June 15, 1976, petitioner is liable for a 20% addition to tax under section 6651(a). See section 301.6651-1(b)(2), Income Tax Regs.
Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the post-trial procedures set forth in that rule are not applicable to this case.
3. The parties have agreed that petitioner had a basis without improvements in each of the lots on Notre Dame Road and Davis Road of $ 100.↩
4. This figure includes an oral stipulation made at trial concerning the amount of closing costs incurred by petitioner.↩
5. In his notice of deficiency respondent calculated this portion of the deficiency in accordance with section 183(b)↩.
6. The record does not disclose the amount of losses incurred by petitioner from 1946 through 1969.↩
7. Petitioner offered no evidence, and did not contend, that the provisions of section 1237 are applicable in this case.↩