WILLIAM E. AND ELIZABETH URICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Urick v. Commissioner
Docket No. 20195-81.
United States Tax Court
T.C. Memo 1983-60; 1983 Tax Ct. Memo LEXIS 727; 45 T.C.M. (CCH) 624; T.C.M. (RIA) 83060; February 1, 1983. William C. McClure and Mark F. McKenna, for the petitioners. Russell F. Kurdys, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1977
$8,193.00
1978
4,005.00
Some adjustments in the notice of deficiencies have been conceded by the petitioners. The only issue presented for decision is whether gains realized from sales of lots by petitioner William E. Urick during 1977 and 1978 are taxable as ordinary income or as capital gains. The resolution of this issue depends *728 upon whether, at the time of the sales, the lots were held by petitioner primarily for sale to customers in the ordinary course of his trade or business. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. William E. Urick and Elizabeth Urick (petitioners) are husband and wife who resided in Monroeville, Pennsylvania, at the time they filed their petition in this case. They filed joint Federal income tax returns for the years 1977 and 1978 with the Internal Revenue Service Center at Philadelphia. In 1949 William E. Urick (hereinafter individually referred to as petitioner) began working as a truck driver. In 1955 he was employed by Lampl Asphalt and Paving, Inc. as manager of a gas station. From 1958 until June 1976 the petitioner worked primarily for Lampl as an estimator for asphalt paving, although he also personally supervised crews and inspected job sites for Lampl. During that period Lampl was a general construction contractor which did various types of construction work including subdivision work. In June 1976 the petitioner and John Scott formed W.E. Urick, Inc., which has since been engaged in the business of excavating and laying water *729 and sewer pipes in all types of developments including subdivisions. On July 30, 1926, Frank Urick and Dora Urick, the father and mother of petitioner, purchased 95.66 acres of land located in the Borough of Monroeville, Pennsylvania (herein referred to as the property) for $5,000. The Borough of Monroeville is a suburb of Pittsburgh, located approximately 8 miles east of downtown. Between 1926 and 1946 the property was used by the Uricks as a dairy farm and as a chicken and turkey farm. The contour of the land was very steep. This limited the acreage which could be farmed and made difficult the use of modern equipment, such as tractors. On March 11, 1946, Frank Urick died and the ownership of the property passed to his wife, Dora. She remained on the property and continued some very limited farming activities until 1960 when her son, Frank Urick, married and moved away. Dora was then 70 years of age and could no longer afford to maintain the property. Thus, in part to provide a means of support for herself, Dora entered into an agreement on August 1, 1960, to sell the property to her son, John J. Urick, and his wife, Nelda. The agreement provided that deeds to the property *730 would not be forthcoming from Dora until payment by John or Nelda Urick of $1,000 for each one-acre conveyance. The acre conveyed was to be selected by John and Nelda out of the property. The agreement also provided that John and Nelda would have the right to improve the property by installing utilities and constructing homes thereon. In 1966 John had to move to a drier climate (California) because he had asthma. Until that time John had not developed any plans to subdivide the property. On January 1, 1966, Dora, John, Nelda and the petitioner entered into an agreement regarding 93.92 acres of the property. This agreement provided that the agreement of August 1, 1960, whereby John and Nelda agreed to purchase the property from Dora for $60,000, payable $10,000 down, and the balance of $50,000 in monthly installments of $100 each, and also providing for the conveyance by Dora to John and Nelda of portions of the property at the rate of one acre for every $1,000, would be assigned to petitioner in return for his agreement to pay to John the sum of $18,000. Dora also agreed to deliver to petitioner a general warranty deed for the 93.92 acres, consisting of the remainder of the *731 property in question, and petitioner agreed to pay to Dora the sum of $42,108, payable in monthly installments of $100 each. The agreement also incorporated a mortgage given by petitioner to Dora simultaneously with the execution of the January 1966 agreement as petitioner's bond and mortgage in the amount of $42,108 covering his obligation to Dora under the agreement. The mortgage was secured by 77.92 acres of the property. Under the terms of the January 1966 agreement, Dora agreed to release the mortgage lien from 77.92 acres at the rate of 1 acre for every $1,000 paid to her by petitioner. The petitioner had the option to select the properties to be released from the mortgage, and to anticipate the payment of the remaining amount due under the mortgage and the agreement. Dora agreed to execute and deliver a satisfaction piece under the agreement at the time that the $42,108 was paid in full. Petitioner, to secure his payment to John Urick, in consideration of John's assigning his August 1960 agreement rights to him, agreed to and executed a bond and mortgage in John's favor in the amount of $16,000, secured by 16 acres of the property. John agreed to release the bond *732 and mortgage at the rate of 1 acre for every $1,000 paid. Petitioner had the right to select the property to be released and to anticipate payment of the obligation in full or in part. On January 3, 1966, Dora executed and delivered to petitioner a general warranty deed as provided in the January 1, 1966 agreement. This deed was recorded in Allegheny County, Pennsylvania, on November 23, 1966. On May 1, 1967, Dora and petitioner entered into an agreement whereby Dora executed a satisfaction piece on the mortgage provided for in the January 1, 1966 agreement covering 77.92 acres of the property. Prior to the construction loan, the petitioner in 1966 began development of the property by spending $1,240 on the following development costs: Engineering
$986.00
Blueprints
4.00
Planning Commission
250.00
In March or April 1966, the petitioner offered the property for sale to developers by an exclusive listing with Raymond A. Capone Realty Company. Raymond A. Capone, through his company's exclusive listing agreement with petitioner, unsuccessfully attempted for three to four months to sell the property to local developers. Mr. Capone then advised petitioner *733 that the best way for him to enhance the profitability of the disposition of the property would be to subdivide it, and install all necessary utilities and made it available to the public as lots for building single family houses. By the spring of 1966 the land adjacent to the property, known as Foxwood, was in the process of being developed with single family homes. Also by 1966 the Borough of Monroeville, due to the presence of the Pennsylvania Turnpike which had been completed across the State in the early 1950's, and the connecting road (Parkway) from the Turnpike to downtown Pittsburgh, had become an active commercial and residential real estate market. The subject property is within 3 miles of the interchange of the Pennsylvania Turnpike and the Parkway which runs into downtown Pittsburgh. The mortgage satisfaction made by Dora on May 1, 1967, was executed to enable petitioner to obtain a first mortgage development loan and to proceed with the orderly development of the property.
Petitioner obtained a development loan from Guaranty Savings and Loan Association of Pittsburgh in November 1967 in the amount of $180,000 for the term of three years at an interest rate of *734 6 percent secured by a mortgage on the property.The loan had a three-year term and required monthly payments of interest only. In 1970, the loan term was extended one year. The loan agreement also required that Guaranty Savings and Loan Association would receive 90 percent of the proceeds of the sale of any lot with a minimum receipt of $7,500.Guaranty Savings and Loan was to receive a penalty fee of $50 if it did not participate in the construction loan for residential housing on each lot sold. The construction loan funds granted by Guaranty Savings and Loan Association were taken down by petitioner by draws based on completed work during the subdivision construction. In 1966 and 1967, Raymond Capone was in the business of consulting and advising on subdivision of real estate and subdeveloping on his own in the Pittsburgh area. Capone Realty Company obtained an exclusive listing for the sale of the subdivided lots on the property which was entered in the Pittsburgh East Suburban Multilist on July 31, 1967. Raymond Capone advised the petitioner with respect to the development of the property. Mr. Capone was paid a fee for services in helping to develop the land which *735 was in addition to the fee provided Capone Realty Company for the sales of the subdivided lots. In addition, Mr. Capone arranged the construction loan of $180,000 from Guaranty Savings and Loan, he prepared an economic feasibility study, and he advised petitioner on various aspects of the development. Raymond Capone advised petitioner that, despite the steep topography of the property, a subdivision development would be profitable because of a comparable development in the eastern part of Allegheny County where similar type lots had been subdivided and sold for the construction of California "contemporary" houses. And, because of the growing number of research centers in the Monroeville area, Capone thought the market demand would be from "sophisticated" buyers, including engineers and chemists who would desire that type of housing. After petitioner consulted with the engineering firm of Thompson Survey Service and Raymond Capone, it was decided that the minimal size of the lots would be about 1 acre. Some of the lots in the plan are as large as 2 acres. An economic feasibility study prepared by Mr. Capone for petitioner and presented to Guaranty Savings and Loan Association *736 projected all costs for the development of the property, including initial acquisition costs, utilities, engineering, and the sell-out prices of 27 of the 39 lots in the projected plan. The projected sell-out price was $308,000 with a projected net pretax profit to petitioner after all expenses of $77,000. The projected sell-out period for phase one of the plan (27 lots) was two years. The economic feasibility study did not include certain parcels of real estate on the property adjacent to the developed lots, called parcels A and B, because those areas were considered to be too steep to develop. Compared to a normal subdivision project, the property was more difficult to subdivide and make ready for use as lots for single family homes because of the steep grades involved, which required an unusual amount of dirt to be moved and caused problems in laying the sewer lines. In 1966 petitioner contracted with Thompson Survey Service to do all the engineering work on the development of the property. Thompson was paid on an hourly basis. Its duties were to produce the engineering studies, maps, drawings and plats necessary to produce a finished development.These plans included *737 drawings for the storm sewers, detailed road maps, and other engineering work. Thompson prepared two subdivision plans concerning the property, both of which were later submitted to the Monroeville Borough Planning Commission. Most of the subdivision work for both plans was done in 1966 and 1967, including the engineering work, but the first plan submitted in 1966 to the Planning Commission only covered 27 of the 39 lots eventually subdivided.
The second subdivision plan prepared by Thompson was submitted to the Planning Commission in December 1970, and covered the remaining 12 lots of the 39 lots developed. The filing of two plans instead of one plan including all lots was done to save local real estate taxes. In 1966 Thompson was paid $986 by petitioner to produce the plan and survey of the property, and $250 was paid to the Planning Commission as a fee for filing the plan produced by Thompson covering the first phase (27 lots) for the development of the property.
In 1967 the petitioner incurred $122,298.66 in expenses for the development of the property. The funds expended were for engineering expenses and drawing the plans, funds paid to the Monroeville Planning Commission *738 for submission of the plan and other matters. The following is a breakdown of the 1967 expenses: Expense
Amount
Excavation
$ 2,800.50
Engineering
9,921.57
Legal Fees
493.00
Planning and Related Fees
214.00
Water Lines
14,500.00
Recording Fees
160.00
Mortgage Recording
155.46
Underground Wiring
2,370.00
Excavation
1,184.13
Title Search
500.00
Water, Sewer, Street
Installation and
Excavation
90,000.00
Total
$122,298.66
Of the above amounts, the $90,000 for water, sewer, street installation and excavation and the $2,800.50 and $1,184.13 for excavation were initially paid to Lampl, Inc. Of these amounts, $54,000 to $55,000 was paid by Lampl, Inc. to David Fiori, the excavator, who was working on the property. The $14,500 paid for water lines was paid by petitioner to the local water company for water pipe used for water lines on the property. The $9,921.57 paid to Thompson was Thompson's hourly fee for their engineering work, drawings, design and supervision regarding the storm sewers, sanitary sewers, road work and other subdivision work.The $2,370 paid by petitioner for underground wiring was paid to Duquesne Light Company, a local electric *739 company, to install wiring on the property. The $54,000 or $55,000 paid by Lampl, Inc. to David A. Fiori out of the $93,984.63 paid to Lampl, Inc. by petitioner in 1967 was due to an arrangement between Fiori and petitioner whereby Fiori began work on the property before petitioner obtained his development loan. The funds paid to Fiori were advanced by Lampl, Inc. to petitioner as a loan. The payments to Lampl, Inc. of $93,984.63 were to cover the $54,000 or $55,000 advanced by Lampl, Inc. to Fiori and the remainder was payment for the work performed by Lampl, Inc. on the property during 1967. Petitioner knew Fiori from his work at Lampl, Inc. since he was an independent contractor who had often worked for Lampl, Inc. prior to 1966. In the winter of 1966 and 1967 the petitioner contacted Mr. Fiori and hired him to do the excavating work on the property. The arrangement with petitioner as to Mr. Fiori's work was that he would be paid on a per hour machine use basis. The arrangement was oral and it was made with and at the instigation of petitioner. Mr. Fiori, his men and machines started to work on the property immediately, and excavation was completed in early 1967. Mr. *740 Fiori billed Lampl, Inc. even though he was working directly for petitioner.
With respect to major decisions and financial matters regarding the excavation, Mr. Fiori consulted with petitioner and Thompson. Mr. Fiori met or talked with petitioner about three times a week during the excavation work which took about six weeks. The excavation job was an extraordinarily difficult task because of the steep grade of the property which necessitated a large amount of earth (estimated at about 55,000 tons) to be moved. Lampl, Inc. began its work of putting in sewers, water lines, and the streets on the property soon after the excavation work was completed. During the development of the premises the petitioner worked for Lampl, Inc. as an estimator of the cost of various general contracting work Lampl, Inc. was involved in, including subdivision work for home builders and developers. Petitioner as an individual hired Lampl, Inc. to complete the subdivision of the property by installing sewers, water lines and roads. Lampl, Inc. and petitioner had an oral agreement whereby Lampl, Inc. would perform its services for petitioner on a cost plus profit arrangement. Petitioner, as *741 an employee of Lampl, Inc., performed services on the development of the property which included, among other things, estimating the cost of putting in the asphalt roads. Throughout the construction and development of the property the petitioner checked on the development work and progress. Throughout the development of the property the petitioner had final authority for the design, planning and aesthetics of the subdivision. In 1968 petitioner expended a total of $3,826.39 on the following development costs: Engineering
$ 50.85
Water Lines
5.68
Trenching
2,542.09
Legal Fees
1,093.87
Electrical
133.90
Total
$3,826.39
The $2,542.09 paid in 1968 for trenching was paid to Lampl, Inc. In 1972 petitioner expended a total of $19,110.50 in development costs as follows: Duquesne Light Co. for
Utilities Installation
$ 2,957.00
Lampl, Inc. for Road
Installation
16,153.50
Total
$19,110.50
In 1975, petitioner expended a total of $4,375.00 to install gas lines on the property. After Mr. Capone and petitioner agreed to begin developing the property, Capone Realty and petitioner entered into a written exclusive sales contract which *742 provided that Capone Realty Company would have the exclusive sales rights for the 39 lots for a period of one year. The agreement also provided that Capone Realty was to receive a sales commission of 10 percent of the gross sales price on the sale of a vacant lot, and 5 percent on the sale of a lot with a house on it as long as a buyer was presented with the listed prices for the lots, regardless of whether or not petitioner agreed to the sale. The agreement with Capone Realty was renewed for one year and expired sometime in 1969. During the period of time Capone Realty had the exclusive sales agreement on the property, four lots were sold as follows: Lot No.
Date of Sale
Sales Price
Net Gain
3
2/27/68
$10,200.00
$3,989.75
20
2/29/68
11,900.00
5,526.25
1 and 2
6/10/68
15,800.00
10,735.25
Lot Nos. 1 and 3 were sold through Capone Realty to two local builders, Mr. Sudak and Mr. Misenko, who were to build two "speculative" or unsold houses on the lots. The type of houses to be built by Sudak and Misenko on the two lots were shown to and approved by petitioner before they were built.
The two houses built by Sudak and Misenko were the first *743 built on the property. One was used by Capone Realty as a model home. Capone Realty spent proportionately more advertising dollars on the property than any other sales project Capone Realty ever had. When Capone Realty's sales effort did not produce the volume of sales originally contemplated, Raymond Capone and petitioner discussed the possibility of lowering the prices on the lots. They decided against lowering prices. All of the lot sales agreements from 1968 through 1978 were signed by petitioner and he executed the deeds for the lots. The initial prices for the lots were established by taking into account costs, basic raw land value, plus the projection of a proit of 25 percent of the gross selling price.
Petitioner and Raymond Capone agreed on the use of protective covenants on the property to be filed of record with the subdivision plan to ensure the orderly and profitable development and sale of the property. The covenants required all houses built on the property to conform to local building codes and to be of a minimum size. Capone Realty used all the normal advertising media during its exclusive listing of the premises, and also extensively used cooperative *744 advertising. No lots were sold during 1969, 1970 and 1971.
In 1971, with the help of Hammill-Quinlan Realty Company, petitioner refinanced his construction loan with Guaranty Savings and Loan Association by taking out a new loan for $135,000 at Friendship Federal Savings and Loan Association. As a condition to obtaining the refinancing loan from Friendship Federal Savings and Loan Association, petitioner agreed that he would begin construction of at least three one-family residential structures on the remaining lots and that in a period of not more than three years from the granting of the loan he would complete residential structures on all of the remaining lots. The loan with Friendship Federal Savings and Loan Association was for a term of three years with an interest rate of 9-1/2 percent, with monthly payments for interest only. In 1971, at about the same time as the new loan was obtained, petitioner entered into an exclusive sales agreement with Hammill-Quinlan Realty Company whereby Hammill-Quinlan obtained the exclusive sales contract to sell the remaining lots on the property for a fee of 10 percent of the gross sales price for undeveloped lots and 5 percent for *745 the sale of lots with a house built on it. Petitioner set the initial prices of the lots to be sold by Hammill-Quinlan. Hammill-Quinlan had the exclusive sales rights on the property from 1972 through 1978. After 1978, no exclusive agreement was given by petitioner. Whatever real estate company brought in a sale received a customary commission. The loan from Friendship Federal Savings and Loan Association was paid off in 1976. In order to meet the conditions of the Friendship Federal loan, the petitioner brought in Quality Construction Company as a builder in 1972 to build a house on Lot No. 21. He also arranged for his brother, Michael, to build two houses on the property. In 1972 and 1973, Hammill-Quinlan Realty Company sold the lots and houses built by Quality Construction Company and Michael Urick. In 1975, in order to facilitate the sale of the remaining lots on the property, petitioner was persuaded by Hammill-Quinlan to sell his residence adjacent to the property and to build a house on two of the subdivided lots. This house became his new residence and it is still his personal family residence. It is located on 105 Urick Court, Monroeville, Pennsylvania. *746 A breakdown of the lot sales from 1968 through 1981 is as follows: Lot No.
Date of Sale
Sales Price
Net Gain
3
2/27/68
$10,200.00
$3,989.75
20
2/29/68
11,900.00
5,526.25
1 and 2
6/10/68
15,800.00
10,735.25
Total lots sold in 1968 - 4
No lots were sold in 1969, 1970 and 1971
21
9/22-72
$10,000.00
3,599.00
22 and 23
9/15/72
18,000.00
5,387.00
25
12/26/72
10,000.00
3,611.00
30
5/31/72
10,000.00
3,628.00
31
7/11/72
10,000.00
3,628.00
Total lots sold in 1972 - 6
16
9/16/73
$11,900.00
5,337.00
17
9/16/73
11,900.00
5,359.00
18
9/20/73
12,900.00
6,217.00
19
9/20/73
12,900.00
6,217.00
35
9/20/73
12,900.00
6,216.00
39
9/20/73
12,900.00
6,216.00
24
5/ 2/73
9,975.00
4,220.00
Total lots sold in 1973 - 7
26
1974
$15,994.00
8,342.00
32
1974
14,900.00
7,704.00
Total lots sold in 1974 - 2
36
5/ 1/75
$15,994.00
7,617.00
28
5/ 5/75
14,900.00
7,926.00
Total lots sold in 1975 - 2
13
1976
$14,900.00
6,571.00
28
1976
13,900.00
6,571.00
Total lots sold in 1976 - 2
15
6/ 3/77
$16,900.00
9,390.00
11
6/ 8/77
13,900.00
6,560.00
14
6/ 9/77
13,900.00
6,576.00
27
7/ 8/77
14,900.00
7,448.00
37
10/18/77
15,900.00
6,775,00
10
2/11/77
14,900.00
7,462.00
Total lots sold in 1977 - 6
38
4/10/78
$16,900.00
$9,389.00
Total lots sold in 1978 - 1
4
7/23/79
$16,900.00
$9,714.00
5
12/ 5/79
20,000.00
11,947.00
Total lots sold in 1979 - 2
38
11/ 4/80
$ 1,094.00
$1,094.00
Total lots sold in 1980 - 1
No lots sold in 1981
*747 The following lots were sold by petitioner through various real estate sales companies in the Pittsburgh area: Lot No.
Date of Sale
Sales Price
Net Gain
4
7/23/79
$16,900.00
$9,714.00
5
12/5/79
20,000.00
11,947.00
38
11/4/80
1,094.00
1,094.00
From 1972 through 1978, when Hammill-Quinlan sold a lot through its agent it would present petitioner with the sales agreement and he would approve it and deed the property to the buyer. Throughout the period from 1972 through 1978 Hammill-Quinlan changed the prices of the lots held for sale in accordance with prevailing market conditions. The total expenses of carrying the property during the years 1966 through 1978 for taxes and interest incurred by petitioner were as follows: Year
Net Carrying Cost
1966
$ 477.00
1967
1,266.00
1968
8,325.00
1969
8,843.00
1970
8,604.00
1971
13,713.00
1972
13,118.00
1973
11,056.00
1974
6,865.00
1975
4,494.00
1976
4,095.00
1977
9,840.00
1978
2,026.00
Total
$92,722.00
The cost of carrying the property reduced the amount received by petitioner to $90,994, which was 16 percent of his net pretax proceeds of $549.561. *748 For the years 1966 through 1978, the petitioner received total salary income of $318,290. He and his wife had income from other sources, excluding the sale of lots for that period, of $140,285. His salary from Lampl, Inc. for 1966, 1967 and 1968 was $11,840, $22,000 and $22,000, respectively. In his notice of deficiencies dated May 6, 1981, respondent determined that petitioner's gains from the sales of the lots during 1977 and 1978, which were reported as capital gains, are taxable as ordinary income because they were held by him for sale in carrying on a trade or business. ULTIMATE FINDINGS 1. Raymond Capone, Capone Realty Company, Thompson Survey Service, Lampl, Inc., David Fiori and Hammill-Quinlan Realty Company were all agents of petitioner in performing work in developing and subdividing the property and selling lots. They all acted under his final direction and control. 2. The six lots sold in 1977 and the one lot sold in 1978 by petitioner were, at the time of their sale, held by him primarily for sale to customers in the ordinary course of his trade or business. OPINION The issue confronting us is whether the gains received by petitioner during 1977 *749 and 1978 from the sales of lots are taxable as ordinary income, as determined by respondent, or as long-term capital gains, as contended by petitioner. Its resolution depends on whether the subject property was held by petitioner "primarily for sale to customers in the ordinary course of his trade or business," so as to be excluded from the definition of a capital asset under section 1221(1). [1]
Petitioner maintains that, at the time of the *750 sales of the lots, he held the property as a capital asset and not for sale to customers in the ordinary course of his business, and that his activities with respect to the property were insufficient to constitute a trade or business. He argues that this was merely a sale of a "family farm" which was subdivided to make it easier to sell and get capital gains treatment. He contends that he engaged people in the real estate business to carry out his purpose so that the property could be sold at a higher profit to provide support for his mother. To the contrary, respondent argues that the totality of the facts clearly establish that the petitioner held the property primarily for sale to customers in the ordinary course of his business. Essentially the issue is factual. United States v. Winthrop,417 F.2d 905 (5th Cir. 1969); Kelley v. Commissioner,281 F.2d 527 (9th Cir. 1960), affirming a Memorandum Opinion of this Court. The same issue under varying factual situations has been litigated numerous times and the courts have repeatedly emphasized that each case must be decided on its own facts. Certain factors have been recognized as helpful *751 guides in reaching the correct result. Among them are: (1) the reason, purpose, and intent for which the property was acquired and held; (2) the frequency, continuity, size, and substantial nature of the transactions claimed to result in a trade or business; (3) the activities of the seller or those acting for or in concert with him in the improvement and actual disposition of the property; (4) the extent of improvements made to the property sold; (5) the proximity of sale to purchase; (6) the nature and extent of the taxpayer's business; (7) the extent of advertising to promote sales; and (8) listing the property for sale directly or through brokers. Equally important to a proper consideration of the issue is our recognition that the capital gain provisions, being an exception to the normal tax rates, are to be construed narrowly, Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955); that these provisions were adopted to relieve taxpayers from the burden of high graduated rates imposed upon gains which were realized within a given tax year but which resulted from gradual appreciation over a long period of time, Burnet v. Harmel,287 U.S. 103, 106 (1932); *752 and that the statutory provision here involved is intended to distinguish between those situations where the taxpayer's profit is expected to arise merely from appreciation over a period of time and those in which it arises from the taxpayer's actions and activities with regard to the property. Kemon v. Commissioner,16 T.C. 1026, 1032-1033 (1951); Frank v. Commissioner,321 F.2d 143, 151 (8th Cir. 1963). Since the answer must be determined from all the facts and circumstances present in this case, we think it would serve no useful purpose to embark upon a detailed discussion and analysis of the facts contained in many of the cases cited by both parties in their briefs. Suffice it to say that we have examined and considered all of them. As applicable to the facts of this case, we will comment on some of the pertinent factors previously mentioned, realizing that no single factor or test is dispositive. Kaltreider v. Commissioner,255 F.2d 833, 838 (3d Cir. 1958), affg. 28 T.C. 121 (1957). The primary thrust of petitioner's position is that he was merely disposing of a "family farm" so that he could support *753 his elderly mother. He tries to make his evidence fit the bed of Procrustes, which unfortunately it fails to do so. His contention that he was acting almost like a trustee liquidating the property to provide support for his mother is not supported by the facts herein. He testified, and the record shows by his actions, that he bought the property primarily to sell it at a profit.When he could not sell the whole property, he decided to sell it lot by lot in order to maximize his profits. He paid his mother and brother just as he would have had to pay any seller. Prior to 1966 the petitioner was an employee of Lampl, Inc. holding various jobs and, at the time of acquisition of the property, he was an estimator for Lampl, estimating the cost of excavations, the installation of streets and utility lines. He also made drawings for excavation and utility line work, such as sewer drawings. At the time he acquired the 93.92 acres from his mother and brother in January 1966, he was an employee of Lampl involved in the business of developing real estate. It seems to us that he approached the acquisition of the property from the point of view of a real estate developer or dealer because *754 of his background and because, after he purchased the acreage, he immediately held it out for sale to developers in the Pittsburgh area. We think his real estate trading motivation was evident from the outset of the property's development. He never intended to hold the property as a long-term passive investment. In Pennroad Corporation v. Commissioner,261 F.2d 325 (3d Cir. 1958), affg. 29 T.C. 914 (1958), the Court of Appeals held that a corporation which bought, held and sold real estate in order to generate increases in traffic for a related railroad corporation, held and sold the property in the ordinary course of its real estate business. The fact that the taxpayer restricted its sales to purchasers who would buy large tracts and that the taxpayer carried on little subdividing activity did not prevent it from being in the real estate business. The Court stated at page 330: The taxpayer's contention that its sales were not conducted in the ordinary course of business since it restricted sales, by and large, to purchasers who would in turn increase the traffic of the Canton Railroad has been adequately answered by the Tax Court. We find nothing *755 in Section 117 which would indicate that sales to a somewhat restricted group of purchasers are not to be considered as sales to customers. The word is to be given its normal meaning and under these facts, it is abundantly clear that Canton had "purchasers" or "buyers" for its real estate. Here the petitioner initially restricted his sales activities to real estate developers. These developers at that point in time were his customers. His activities at that point in time, as an employee of Lampl and as owner of the property in question, put him in the real estate business for purposes of section 1221. By 1977 that business had grown substantially. Petitioner and his first sales agent, Mr. Capone, testified that the purpose of the initial attempt to sell all the property was to maximize the profit petitioner could make on the sale. In our view the petitioner was holding the property after acquisition and through 1978 "primarily for sale." Malat v. Riddell,383 U.S. 569, 572 (1966). Although the purpose of his acquiring the property is not determinative in this case, we think petitioner acquired the property in January 1966 for sale to customers in the ordinary *756 course of his business, held the property as such through 1977 and 1978, and sold lots in 1977 and 1978 in the ordinary course of his business. The original purpose for which he bought the property did not change from 1966 through 1978. Furthermore, his real estate development activities regarding the property in the years 1966 through 1976 and his numerous sales and other activities show that in 1977 and 1978 he sold the lots in question as part of the activity of his real estate business. Farry v. Commissioner,13 T.C. 8 (1949). From 1966 through 1975, petitioner spent $150,749 (nearly three times his land cost) in subdividing the property by hiring engineers to do the plans, drawings, detail designs and the subdivision work with the Borough of Monroeville, paying an excavator some $55,000 to move tons of earth, hiring Lampl to install streets, sewer lines, water lines and other utility hook-up lines and by hiring a local developer, Raymond Capone, to consult with him as to the feasibility and profitability of the project. Through 1976 the gross sales for the 23 lots sold were $271,863.That amount was not much less than the $318,000 petitioner earned from *757 his salary from 1966 through 1978. His net pretax profit through 1976 was $124,617.25, excluding interest and real estate taxes. Just as in any other business enterprise, petitioner had operating expenses consisting mainly of local real estate taxes and interest on his construction loans. From 1966 through 1976 these operating expenses totaled about $80,000. From 1966 through 1978 the operating expenses were $92,722. Thus, by the end of 1976 the petitioner was substantially engaged in the real estate business. As to Thompson Survey Service, the engineering firm on the project, petitioner also exercised control. Thompson was his agent. He paid Thompson by the hour for its work. He made the final decision as to the design of the subdivision produced by Thompson and its submission to the Borough of Monroeville. He, through Thompson, was the ultimate planner of the subdivision. The activity of a taxpayer's agent or contractors in developing, selling, designing, planning and other real estate activities are attributed to the taxpayer for purposes of determining if the taxpayer is in *758 the real estate business. Cf. Kaltreider v. Commissioner,255 F.2d 833 (3d Cir. 1958). As to Mr. Capone, Capone Realty Company, Lampl, Inc., Mr. Fiori, Hammill-Quinlan Realty Company and Thompson Survey Service, the persons and entities which performed most of the tasks of subdividing and selling the tract, the petitioner had control over all of them in terms of hiring, firing, and overall policy decisions, including the pricing of the real estate. The engineering, consulting and sales work of Mr. Capone and Thompson Survey Service, the excavating work of Mr. Fiori, and the remaining subdivision work performed by Lampl are all attributable to petitioner for purposes of determining whether or not and when he was in the real estate business. All of them were hired personally by petitioner, and except for the exclusive sales agreement with Capone Realty Company and Hammill-Quinlan Realty Company, all of the work was done on an oral contract basis.
Although much development activities and sales activities were carried on by persons other than petitioner, the law is clear that the effect of this behavior is as though the taxpayer had directly engaged in such activities. *759 Kaltreider v. Commissioner,supra. Petitioner cannot insulate himself, as he has attempted to do, from the acts of people whose efforts were combined with his to produce a subdivision and to make a profit. We think his activities, combined with the activities of all of his agents, employees and others, placed him in the real estate business in 1977 and 1978. It is also significant that in June 1971, as a condition of refinancing his development loan through Friendship Federal Savings and Loan, the petitioner agreed to begin construction of at least three one-family structures on the remaining unsold lots within six months, and he also agreed to build to completion within three years, one-family residential structures on all the remaining lots. In an effort to meet these conditions, petitioner personally financed the construction of one house built by his brother, Michael, who built two houses in the subdivision. An arrangement was also made with another builder, Quality Construction Company, to build one house in the subdivision. Even though the three builders purchased the lots prior to construction, their construction activity as a matter of law is attributable *760 to petitioner in determining his status of being in the real estate business. Petitioner's personal efforts were intentionally combined in a mutual endeavor with his brother and the Quality Construction Company to make a profit in their joint efforts. The legal form of the endeavor is not relevant. The activities of the builders are attributable to petitioner. See and compare Bauschard v. Commissioner,279 F.2d 115 (6th Cir. 1960), affg. 31 T.C. 910 (1959). Petitioner's substantial expenditures of personal time and energy, hiring of agents working on the subdivision to make improvements to enhance the value of the property, offering the lots for sale at a price in excess of the cost of land plus improvements, making frequent and continuous sales over the period from 1967 through 1978, are activities of a person in the real estate business, and not those of a passive investor. Kelley v. Commissioner,281 F.2d 527 (9th Cir. 1960), affg. a Memorandum Opinion of this Court. Standing alone, the frequency and continuity of sales from 1968, when four lots were sold, through the end of 1976, when a total of 23 lots had been sold, *761 show that throughout 1977 and 1978, when a total of seven lots were sold, the petitioner was engaged in the real estate business. Cf. Pointer v. Commissioner,48 T.C. 906 (1967), affd. 419 F.2d 213 (9th Cir. 1969). Petitioner argues that "sales were sporadic over the years and were dictated by market conditions at the time." The fact that sales were dictated by market conditions is a fact of life confronting any business endeavor. The number, extent and profit from sales, as set forth in the stipulation of facts, certainly indicate that the petitioner was attempting to sell the lots as market conditions permitted. The market in certain years was good and in certain years it was bad. This produced more sales in some years than in others. This fact alone indicates a normal businessman's approach to a rather volatile market, i.e., selling in good markets and withholding sales in bad markets.Such a practice is basic to the real estate industry and cannot, by any stretch of the imagination, be turned into an argument indicating that petitioner was not in the real estate business. The higher sales in good markets and lower sales in bad markets are evidence *762 of petitioner's real estate business acumen. Petitioner contends that the instant case falls within the ambit of Barrios' Estate v. Commissioner,265 F.2d 517 (5th Cir. 1959), reversing 29 T.C. 378 (1957), and Yunker v. Commissioner,256 F.2d 130 (6th Cir. 1958), reversing 26 T.C. 161 (1956). In our judgment both of these cases are distinguishable on their facts. The widowed taxpayer in Barrios was held not to be engaged in the real estate business because: It is conceded that the taxpayer bought the land to live on and to operate a farm, and that she abandoned this purpose only when she had to; it is further conceded that she never intended to go into the real estate business, and that she never improved the lots by erecting buildings and never bought or sold other parcels of land, although importuned so to do; that she never engaged in any form of advertising, or employed a real estate agent, or solicited a prospective purchaser. [265 F.2d at 520.] The widow, who had a college agricultural education, was simply liquidating acreage acquired for farming. A governmental entity had completed *763 a canal which made farming impossible for her and, as the Court of Appeals said: Being thus dispossessed of the farming operation through no act of her own, she set about to dispose of the land in as advantageous a way as was open to her. * * * [265 F.2d at 518.] By contrast, the petitioner was in the real estate business for his own account as a subdivider of the premises.During 1977 and 1978 he was not a farmer by profession, as the widow was in Barrios. He was not liquidating a farming operation because of any sudden, adverse event out of his control, as the widow was in Barrios. His decision to subdivide and sell lots was his own voluntary business decision to maximize profits. Furthermore, he did not buy the property to live on and operate as a farm. He did not abandon a farming operation only after being forced to abandon it. He bought the land to sell it at a profit which he tried to do immediately after its acquisition. By the years in issue he was still attempting to sell it lot-by-lot at a profit.He engaged many people to subdivide and sell the land, including two real estate brokers who advertised and sold the lots. Petitioner was neither *764 a farmer nor a widow, but a sophisticated businessman. In the Yunker case the taxpayer, who had no connection with the real estate business, inherited 75 acres of farmland from relatives. After she held the land for 15 years as a farm, a real estate salesman paid for the surveying, subdividing, roadway engineering and negotiated for utilities in return for receiving back his monies plus commissions upon sales of the lots. Mrs. Yunker was a housewife, who was neither interested in, nor had anything to do with, the real estate business. She also had nothing to do with the subdivision work, which was controlled by and paid for by a real estate dealer. Furthermore, the land was sold in tracts of about five acres, and many were sold to real estate developers for subdivision. Such facts are clearly distinguishable from those present in this case. As the widow in Barrios, the housewife in Yunker was liquidating a farm she held and operated for years. By contrast, petitioner, immediately after acquisition, put up for sale acreage which he had neither farmed nor held except for a few months. He did not sell large parcels, but sold to individuals who wanted to build single *765 family homes after he had subdivided and installed all utilities making the lots ready for single family homes. In view of all the facts and circumstances of the instant case, we hold, as reflected in our ultimate findings, that the lots sold by petitioner in 1977 and 1978 were held by him primarily for sale to customers in the ordinary course of his trade or business. Therefore, the gains therefrom are taxable to him as ordinary income. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here involved. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩